STATE OF NEW JERSEY, DEFENDANT IN ERROR, v.
ANGELO CARLINO, PLAINTIFF IN ERROR.

Argued June 9, 1922—Decided November 18, 1922.

1. The mere form of drawing forty-eight names from a general panel of forty-eight is not necessary in a murder case when the general panel consists of exactly that number. It is sufficient if a list of these jurors is served upon the defendant as required by the statute.
2. It is not a valid challenge to the array of jurors that at least twelve of the panel had participated in the prior trial and conviction of another person where the crime charged and the facts proven were substantially the same as the case about to be tried.
3. Where the legislature enacted that if the death of anyone shall ensue from the committing, or attempting to commit, any of the specified crimes, it clearly intended that a man might be held guilty, although he was not the actual assailant, if he was guilty on the theory of constructive presence.
4. The fact that the defendant was out of sight and hearing when the shots fired by his associate in a robbery were fired does not free him from criminal liability, as it is well settled that all who are present, aiding and abetting in a felony, are principals.

---

On appeal.

Before GUMMERE, CHIEF JUSTICE, and Justices SWAYZE and TRENCHARD.

For the defendant in error, *Lewis Van Blarcom, Michael Dunn, Sylvester C. Smith, Jr.,* and *Theodore E. Dennis.*

For the plaintiff in error, *Egbert Rosecrans* and *William A. Dolan.*

The opinion of the court was delivered by

SWAYZE, J.    The defendant was one of a party who assembled in Pennsylvania and went to what is called the Cat swamp between Andover and Stanhope, in Sussex county, under the lead of one Turko. They waylaid a truck laden with silk and rolls used in silk manufacturing. The chauffeur of the truck and his companion were taken by Carlino and three of his associates, tied with ropes as prisoners and abandoned a few hours later. While they were there, one Coster came down the road on a motorcycle on his way to work. Turko stopped him and shot him dead that he might not spread news of the robbery. Carlino is said not to have been within sight or hearing of the spot where Coster was killed. Turko was indicted for, and convicted of, murder. Carlino was also convicted of murder, and his conviction is now before us for review.

When called to plead to the indictment, Carlino pleaded not guilty. When the trial was moved he was allowed, on his own application, to withdraw the plea of not guilty, and then offered to interpose a plea in bar in which he averred that he had been heretofore lawfully acquitted of the same offence charged in the indictment, and stands acquitted of the robbery charged in another indictment, out of which robbery the indictment and charge of murder is said to spring. Inasmuch as neither indictment of Carlino had been tried, this plea is most extraordinary. Counsel contend that because there were two indictments, one for robbery and one for murder, and the state chose to try the indictment for murder first, that election was equivalent to acquittal on the other

indictment, but he does not attempt to explain how a mere election to try one indictment before the other can amount to an acquittal on the indictment not tried. His case lacks the essential element of a verdict, let alone a judgment. The defendant makes a bold attempt to substitute the supposed opinion of the prosecutor of the pleas for a verdict and judgment, and that without even showing cause to believe that it is really an opinion of the prosecutor. It is unnecessary to say more.

The next question arises on the challenge to the array, because the sheriff, who acts as a jury commissioner under the act of 1913, took no oath of office as such, and because the oath taken by the jury commissioner was not in the form required by the statute. This objection is sufficiently answered by the reasoning of the Court of Errors and Appeals in *State* v. *Zeller*, 83 *N. J. L.* 666. It would be manifestly illegal to try the title of the sheriff or the jury commissioner to his office in this merely collateral way. Each is, at least *de facto*, in possession of the office to which he was elected or appointed.

Another objection to the array is the manner of the selection of the jurors summoned. The general panel for the term in Sussex county consisted of forty-eight jurors, and a list of these jurors was served upon the defendant as required by the statute. It cannot now be claimed that the mere form of drawing forty-eight names from a general panel of forty-eight is necessary when the general panel consists of exactly that number. That is required only when the general panel is composed of more than forty-eight. *State* v. *Tomassi*, 75 *N. J. L.* 739. What happened in the present case was that the jury commissioners, either on their own responsibility or the suggestion of the court, anticipated that a large number of jurors might be required, and therefore drew from the whole list of eligible jurors, required by the act of 1913, a further panel of twenty-four in advance of trial—talesmen in the proper sense. This was proper. *Patterson* v. *State*, 48 *Id.* 381.

Another objection to the array was because at least twelve of the general panel had participated in the prior trial and conviction of Turko, and, as the crime charged and facts proved were substantially the same, it is urged that the jurors who sat in the Turko case were not competent jurors for the trial of the present case. *Stephens* v. *State,* 53 *N. J. L.* 245 (at *p.* 252.) It may be that this was good ground for challenge to the polls for favor, but a challenge to the whole array is very different from a challenge even to as many as twelve jurors for favor. The very fact that peremptory challenges are permitted is sufficient to show that the law does not expect a sheriff to secure in every case an impartial juror. No machinery is provided by which the sheriff can be certainly informed what jurors have sat upon a former trial. It is not suggested that the right of a defendant to an impartial jury needs such protection. It is, moreover, quite certain that if such an objection were allowed as ground of challenge to the array, the difficulty of securing a trial in a criminal case would be insuperable. Sufficient protection is afforded by the number of peremptory challenges to the polls.

The defendant also claims that some of the challenges to the polls should have been sustained. All these challenges were based on the previous expression of opinion; most of the jurors said that their opinion was such as would be overcome by evidence. Some admitted that it would take evidence to overcome it. We think these challenges were properly overruled. *Moschell* v. *State,* 53 *N. J. L.* 498. There is no suggestion that there was anything more than the formation and expression of a mere academic opinion.

Another objection to the array is that no women were selected as jurors. We need add nothing to what has already been said by the Chancellor, speaking for the Court of Errors and Appeals in *State* v. *James,* 96 *N. J. L.* 132. It is said that this ruling is no longer applicable in view of the act of 1921 (*Pamph. L.,* *p.* 50), but we fail to find anything in that act to affect the reasoning of the Chancellor. This brings us to the more substantial assignments of error.

The fact that Coster's death was caused by shots fired by Turko, at a time when Carlino was out of sight and hearing, does not free Carlino from criminal liability. It is well settled in this state, following the English law, that all who are present, aiding and abetting in a felony, are principals. *Roesel* v. *State*, 62 *N. J. L.* 216. The question is "what constitutes such a presence as will render a man a principal," and in the Roesel case we adopted the rule that if several persons set out together or in small parties upon one common design, be it murder or other felony, or for any other purpose unlawful in itself, and each takes the part assigned to him, some to commit the fact, other to watch at proper distances to prevent a surprise, or to favor if need be the escape of those who are immediately engaged, they are all, provided the fact be committed, present at it. The illustration given is quite like the present case. "If divers persons come in one company to do any unlawful thing as to kill, rob or beat a man or to commit a riot or to do any other tresspass, and one of them in doing thereof kill a man, this shall be adjudged murder in them all that are present of that party abetting and consenting to the act or ready to aid him, though they did but look on."

A qualification came to be introduced by which the rule was limited to cases where a homicide was the natural and probable result of the crime actually intended. It is enough to refer to the cases cited in 21 *Cyc.* 689. Substantially this limitation is now embodied in section 107 of the Crimes act. The crimes therein specified are all crimes, the natural and probable consequence of which is a homicide.

The question therefore turns on the proper construction of section 106. It is urged that this cannot apply because it professes to legislate as to "any person" in the singular and not "any persons" in the plural. We find it difficult to treat seriously an argument that would make the statute define murder by words intentionally inapplicable to two persons engaged together in the actual deed. There could not be a clearer case for the application of the general provision of

the act relative to statutes. There is nothing in section 106 to indicate that the legislature meant to exclude from its operation the time-honored principles of the common law. The Court of Errors and Appeals has in effect so decided in *State* v. *James* 96 *N. J. L.* 132, and *State* v. *Timmerari, Id.* 442. The question does not seem to have been argued and no doubt was suggested in those cases. It is true they do not deal with a situation where the person accused was so far removed from the scene of the fatal blow as Carlino was, and we must still consider whether the rule of the common law is by statute applicable to the present case. We have no difficulty. When the legislature enacted that if the death of anyone shall ensue from the committing, or attempting to commit, any of the specified crimes, it clearly intended that a man might be held guilty although he was not the actual assailant if he was guilty on the theory of constructive presence.

Our legislation in the sections cited does not suggest any intent to change the law. The crime remains the same crime as before, and the legislation has merely made a distinction with a view to the difference in the punishment between the most heinous and the least aggravated grades of murder, very much as it has in the recent legislation authorizing the jury to substitute life imprisonment for death. *Graves* v. *State,* 45 *N. J. L.* 203; *Titus* v. *State,* 49 *Id.* 36. Under the rule of these cases, anyone guilty of committing, or attempting to commit, a robbery would be guilty of murder if death results. The guilt of committing, or attempting to commit, a robbery is to be ascertained by the principles of the common law establishing liability in cases of a common enterprise, or a constructive presence. The defendant is in this category.

One question remains. Was Carlino no longer responsible for Turko's crime because their joint action in the robbery had come to an end? It is not possible to lay down a hard and fast rule in a matter so largely one of fact. It seems clear to us that as long as the four men remained in

charge of the chauffeur of the truck and his companions as prisoners, just off the highway on which the robbery was committed and within a very short distance of the point where the shots were fired, and as long as the truck and the silk seized by the robbers remained in their control at the scene of the robbery and homicide with the evident intent on their part to return to Pennsylvania—the state from which they came—we think the robbery was not at an end. The robbers themselves must have contemplated further joint action until they had made their escape; holding the chauffeur and his companion as prisoners in bonds was itself an act in pursuance of the concert of action to commit the robbery. The holding of the two men as prisoners was a continuous act, and it would be preposterous to attempt to say at what instant of time, short of their release or escape, the responsibility of the robbers ceased.

Carlino was guilty therefore of murder as defined in section 106 of the Crimes act. The jury ascertained under section 107 that this was murder in the first degree, as it must have been under our construction of section 106.

We think the judge was quite right in telling the jury that their verdict must be either murder in the first degree or an acquittal. We find no other point in the case that it is necessary to consider. Let the judgment be affirmed.