STATE OF NEW JERSEY, DEFENDANT IN ERROR, v. EDWARD WOODWORTH, DONALD N. BROWN AND ANTHONY PANCHELLY, PLAINTIFFS IN ERROR.

Argued May 3, 1938—Decided August 31, 1938.

Before BROGAN, CHIEF JUSTICE, and Justices BODINE and HEHER.

For the plaintiffs in error, *Solomon Golat* (*Herman Marx,* of counsel).

For the state, *Daniel O'Regan,* prosecutor of the pleas, and *Frank G. Schlosser,* assistant prosecutor.

The opinion of the court was delivered by

HEHER, J.  Plaintiffs in error sued out this writ of error to review the judgment given upon their conviction of rob-

bery; and the entire record of the proceedings had upon the trial has been returned with the bill of exceptions, under section 136 of the act relating to procedure in criminal cases (*Comp. Stat.* 1910, *p.* 1863; *Rev. Stat.* 1937, 2:195-16), although the state maintains that, for failure of the statutory authentication, the trial proceedings are not before us.

*First:* It is urged *in limine* that the writ should be dismissed for the reason that plaintiffs in error have ignored the statutory mandate to "cause a transcript of the record to be made and returned with the writ of error" (*Comp. Stat.* 1910, *p.* 2209, § 7; *Rev. Stat.* 1937, 2:195-8), in that "no final judgment is disclosed in such return, since the minutes of the Quarter Sessions Court do not comprise the record to be returned by the county clerk, as clerk of the Court of Quarter Sessions;" and that, in any event, notwithstanding the certificate of the trial judge that the return made in obedience to the command of the writ "contains the entire record of the proceedings had upon" the "trial," plaintiffs in error should not have the benefit of the more extensive review provided by section 136 of the Criminal Procedure act, *supra,* but should be confined to the bill of exceptions.

The last point is clearly untenable. It is predicated upon the erroneous view that where, as here, "the trial court certifies that the plaintiffs in error are bringing up the entire record of the proceedings had upon the trial, there must be in addition a formal authentication of the proceedings themselves." In other words, the record of the trial proceedings must be specially attested by the trial judge "at the end of the stenographic transcript." But here the trial judge's certificate plainly testifies that the return made to the writ embraces a transcript of the trial proceedings conceded to be authentic.

As to the first point, the return incorporates the sentences imposed; and, while couched in informal language in this regard, it of necessity is presumed to disclose the judgment actually entered, since the trial judge has certified that the return so made exhibits the "record and proceedings * * *, with all things touching and concerning the same, as before the Court of Quarter Sessions of the County of Hudson, they

remain, or are in the custody or control of the clerk of said court." And, in view of the admitted confinement of plaintiffs in error in the state prison in execution of the sentences thus imposed, we deem it politic, if not indeed imperative, notwithstanding any formal deficiency, to review the proceedings so embodied in the return.

Thus we are brought to a consideration of the errors assigned on the bill of exceptions and the causes for reversal specified under the statute adverted to. The former are embraced within the latter, and do not require separate treatment.

*Second:* The indictment charged the perpetration of the robbery by plaintiffs in error as principals; and the initial point assigned for reversal challenges the instructions that, if Woodworth and Brown aided and abetted Panchelly in the perpetration of the robbery charged, "all would be guilty of robbery as principals," and that "in a robbery all who are present aiding and abetting in the commission of the robbery are guilty as principals."

Section 120 of the Crimes act of 1898 (*Comp. Stat.* 1910 *p.* 1785; *Rev. Stat.* 1937, 2:166-1), provides that "Any person who shall forcibly take from the person of another, money or personal goods and chattels, of any value whatever, by violence or putting him in fear, and his aiders, procurers and abettors, shall be guilty of a high misdemeanor;" and the argument is made that, by this provision, aiding and abetting is made "a separate substantive crime," and must therefore be charged in terms, and that a principal in the second degree may not be lawfully convicted of the "principal offense" under an indictment charging him only as a principal in the first degree.

In a case such as this, it is requisite only that the indictment accuse the defendant according to the legal effect of the offense. Under the common law, all who are present, aiding and abetting in a felony, are treated as principals, while in the case of misdemeanors all who aid, abet or participate are considered as principals of equal guilt. The distinction between principal and accessory is maintained only as to

felonies. *State* v. *Wyckoff*, 31 *N. J. L.* 65; *Engeman* v. *State*, 54 *Id.* 247; *Roesel* v. *State*, 62 *Id.* 216, 222; *State* v. *Warady*, 78 *Id.* 687; *State* v. *Wilson*, 79 *Id.* 241; *affirmed*, 80 *Id.* 467; *State* v. *Spence*, 81 *Id.* 265; *State* v. *Hanrahan*, 87 *Id.* 1; *affirmed*, 88 *Id.* 391; *State* v. *Carlino*, 98 *Id.* 48; *affirmed*, 99 *Id.* 292; *State* v. *DeBellis*, 5 *N. J. Mis. R.* 375; *affirmed*, 104 *N. J. L.* 187; *State* v. *Churchill*, 105 *Id.* 123; *State* v. *Dolbow*, 117 *Id.* 560; 2 *Hawk. P. C.*, ch. 29, § 1; 4 *Bl. Com.* 34; *Reg.* v. *Greenwood* (1850), 9 *Eng. L. & Eq. Rep.* 535; 2 *Den. C. C.* 453; 5 *Cox, C. C.* 521; *Reg.* v. *Williams* (1841), *Car. & M.* 259; *Rex* v. *Dyson* (1820), *Russ. & R. C. C.* 523. This rule applies to misdemeanors created by statute. *State* v. *Wilson, supra.*

But the insistence is that, "where a statute makes aiding and abetting a separate substantive offense, in addition to creating the principal offense, the common law rule is qualified," and, in that situation, "the law requires an indictment for aiding and abetting and a conviction as such"—citing *State* v. *Wilson, supra.*

The difficulty with this contention is that the legislature has not, by the cited provision of the Crimes Act, created two separate and distinct misdemeanors. Aiding, procuring and abetting in a robbery is not thereby made a distinct substantive offense, punishable as such. It is to be noted, in passing, that the Crimes Act gives no recognition to the common law distinction between felonies and misdemeanors. It classifies all offenses as misdemeanors; the more serious, entailing the greater punishment, are termed high misdemeanors. *Engeman* v. *State, supra; Brown* v. *State*, 62 *N. J. L.* 666, 695; *Jackson* v. *State*, 49 *Id.* 255; *State* v. *Wilson, supra; State* v. *Spence, supra.* But, regardless of whether this classification of statutory crime as misdemeanors serves to abrogate all the incidents of the common law felonies embraced therein, the result is the same. It is an elementary principle of the common law that a newly-created statutory felony possesses all the incidents appertaining to felony by the rules and principles of the common law; and so all the procurers and abettors of the offense are principals or accessories, depending

upon whether they were present, aiding and abetting in the felony, even though the statute is silent as to aiders and abettors. *Coal Heavers' Case*, 1 *Leach C. C.* 64; *Fost.* 428.

Yet it is pointed out that the English statute reviewed in the case last cited was silent as to aiders and abettors; and the insistence is that this constitutes a distinction of substance. We do not entertain that view.

There is no significance in the special mention of aiders and abettors. Their express inclusion within the statutory classification does not, in and of itself, constitute such assistance a "substantive offense," requiring specific accusation as a principal in the second degree or as an accessory. It would seem to be axiomatic that the expression of that which, omitted, would be regarded as an incident of the principal offense does not, standing alone, serve to impart to it a substantially different procedural status. In this regard, as in the statement of the elements of the principal offense, the act under consideration is merely declaratory of the common law. There is an utter lack of indicia of a broader purpose, especially when the language is viewed in the light of fundamental principles. Both the category and the punishment are the same.

Where the punishment is the same for both degrees, the common law observes no distinction of essence between principals in the first and second degree. The accused may be charged either, as he was in law, a principal in the first degree, or, as he was in fact, a principal in the second degree. *Reg.* v. *Crisham* (1841), *Car. & M.* 187; *Reg.* v. *O'Brian* (1844), 1 *Den. C. C.* 9; 2 *Car. & K.* 115; 1 *Cox, C. C.* 126; *Reg.* v. *Rogers* (1836), 2 *Moody, C. C.* 85; 2 *Lewin, C. C.* 119, 297. But the rule is otherwise where, by statute, the punitive consequences are different. The principal in the second degree must in that case be indicted as such, *i. e.*, as an aider and abettor. 1 *East, P. C.* 348, 350; *Rex* v. *Sterne*, 1 *Leach, C. L.* 473; *Mackalley's Case*, 9 *Coke* 67b; *Fost. C. L.* 345.

A design to depart from the "time honored principles of the common law," to borrow the language of Mr. Justice

Swayze in *State* v. *Carlino, supra,* is not to be lightly imputed to the legislature. This classification of such aiders and abettors as principals is basic in our jurisprudence; and its substantial modification should not be made to rest upon bare inference. It is peculiarly a subject for clear and unequivocal expression. The distinction thus sought to be made savors of mere legal sophistry tending to hamper the due course of justice in a field intimately identified with the public safety and welfare. Subtlety of distinction all too frequently frustrates essential justice; and ordinarily it does violence to the legislative will, for such is not the vogue with law-making bodies.

*Third:* It is next urged that there was prejudicial error in the instructions that the defendants, while denying the accusation of robbery, "do not contest their guilt as to assault and battery," but "frankly admit" it, and therefore "there is no issue" for the jury "to decide as far as assault and battery is concerned," and that, if the jury should find them not guilty of robbery, they would nevertheless "have to find them guilty of assault and battery on their own sworn testimony."

It is said that thereby the trial judge withdrew from "the consideration of the jury an essential ingredient of the crime of robbery, which it was necessary for the jury to find existed as a fact, in order to support a conviction for robbery," and that it was "not for the court to direct a verdict on the very heart of the issue, no matter how overwhelmingly positive the court was of the proof in the case." The gist of the argument runs thus: That, while Woodworth and Panchelly "admitted that they struck Schwartz, striking does not always constitute criminal assault and battery;" that Brown testified "he was so drunk that he did not remember what happened;" and that it was "incumbent upon the State to prove, and for the jury to find, that the striking had been committed with felonious intent."

But neither of the accused was convicted of assault and battery. And it goes without saying that battery, aggravated or otherwise, is not an essential ingredient of the crime of robbery. That is implicit in the definition itself. Putting

the victim in bodily fear, without an actual battery, suffices. It is enough that so much force, or threatening by word or gesture, be used as might create an apprehension of danger, or induce a man to part with his property without or against his consent. 4 *Bl. Com.* 244.

There was no exception to the charge, general or special. And we are enjoined, by the express direction of section 136 of the Criminal Procedure act, *supra,* to consider and adjudge the entire record, and, if it discloses that plaintiffs in error "on the trial below suffered manifest wrong or injury * * * in the charge of the court," or in any of the other particulars therein mentioned, and specified as a cause for reversal, to "remedy such wrong or injury," provided that the judgment shall not be reversed "for any imperfection, omission, defect in, or lack of form, or for any error except such as shall or may have prejudiced the defendant in maintaining his defense upon the merits." So, too, where the accused takes a general exception to the charge, under section 140 of the Criminal Procedure Act, *supra,* a reversal is not justified unless "it shall appear" that the erroneous instruction has resulted in "prejudice or injury" to the accused "in maintaining his defense." *Comp. Stat.* 1910, *p.* 1866 *et seq.,* §§ 140-142; *Rev. Stat.* 1937, 2:195-14, 2:195-20; *State* v. *Zdanowicz,* 69 *N. J. L.* 619.

The claimed error does not fall into this category, and for these reasons: The transcript of the trial proceedings discloses that the case was tried on the theory that plaintiffs in error, while guilty of assault and battery as charged in one count of the indictment, were not guilty of the robbery alleged in the other count. Their defense was directed to the major accusation. Schwartz was concededly the victim of a vicious and cowardly battery. Woodworth and Panchelly frankly admitted that they and Brown, without even the semblance of justification, set upon him and inflicted serious injury. Acting in concert, they threw him to the ground, kicked him about the face and head, and rendered him unconscious. He suffered a fracture of the skull—separation of the frontal malar bone on the left side—a loss of teeth, and severe lacera-

tions of the face and head; and, for the treatment of these injuries, he was confined to a hospital for twenty-five days. Brown, not denying his active participation in the attack, pleaded ignorance by reason of drunkenness—a defense utterly lacking in substance. In these circumstances, it is unnecessary to determine whether the trial judge erred as regards the issue framed upon the count charging assault and battery. Compare *State* v. *Seifert,* 85 *N. J. L.* 104; *affirmed,* 86 *Id.* 706. For, while the evidence overwhelmingly established that Brown was a conscious actor in the infliction of the injuries suffered by Schwartz, it was not necessary, to justify his conviction of robbery, to adduce evidence tending to show that he also struck Schwartz.

And the question of defendants' guilt upon the count charging robbery was submitted to the jury under a charge that was not excepted to, and, in its essentials, was legally unexceptionable. What the trial judge said respecting the allegation of assault and battery, when considered in the light of the context and the trial theory, constituted mere comment upon the character and scope of the defense interposed, and was so regarded by counsel. It was not protested that the instruction invaded the substantial rights of either of the plaintiffs in error; and, while a specific objection to the charge is generally not necessary to invoke the review provided by section 136 of the Criminal Procedure act, *supra,* where the error is prejudicial, the failure to complain in this particular instance is significant of counsel's acquiescence in the instruction as a mere statement of the position taken by the defense.

This statutory review is out of the normal course, which on strict error requires an exception to the end, among other things, that the trial judge may be advised that the ruling is to be assigned for error, and thus afforded an opportunity to make timely revision of it, if he so desires (*Engle* v. *State,* 50 *N. J. L.* 272; *Packard* v. *Bergen Neck Railway Co.,* 54 *Id.* 553), and the corrective process is expressly limited to such errors as have worked clear wrong and injury, prejudicial to the defendant in maintaining his "defense upon the merits." The error asserted here, assuming it be such, does not possess

that characteristic. A contrary rule would tend to subvert the due administration of justice in criminal cases. For examples of the application of the rule, see *State* v. *Rusnak,* 108 *Id.* 84; *State* v. *Hughes,* 108 *Id.* 64; *State* v. *Tomaini,* 118 *Id.* 162; *State* v. *Landecker,* 100 *Id.* 195; *State* v. *Juliano,* 103 *Id.* 663.

It is also insisted that, in this respect, the accused have been deprived of their liberty without due process of law, in contravention of the Fourteenth Amendment of the Federal Constitution, in that "a conviction under such an instruction" works a denial of "a fundamental right guaranteed to them under the State law and constitution."

It suffices to say as to this that the state has full control over its judicial procedure, both in civil and criminal cases, "subject only to the qualification that such procedure must not work a denial of fundamental rights, or conflict with specific and applicable provisions of the Federal Constitution." *Brown* v. *New Jersey,* 175 *U. S.* 172; 44 *L. Ed.* 119; 20 *S. Ct.* 77; *Frank* v. *Mangum,* 237 *U. S.* 309; 59 *L. Ed.* 969; 35 *S. Ct.* 582. So tested, the point is frivolous.

*Fourth:* Lastly, it is maintained that the verdict, as to each plaintiff in error, is contrary to the weight of the evidence. That contention is plainly lacking in substance.

The essential point of inquiry is whether the evidence reasonably supports the jury's finding of a community of purpose to perpetrate a robbery, so as to negative the influence of those factors—to be adverted to hereafter—that taint the verdict in the legal sense. Was there an intent to rob, shared in by all? The existence of this common criminal intent is necessarily a matter of inference from all the facts and circumstances. It is not requisite that the confederacy be established by direct evidence. The essential common felonious intent may be deduced from the attendant circumstances. The conduct of the defendants subsequent to the criminal act is a circumstance of no little weight in determining the existence of preconcert or community of unlawful purpose.

Panchelly's guilt of this particular offense is hardly open to question. As to Woodworth and Brown, it is vigorously

insisted that there is no rational basis in the proofs to sustain the finding of their participation in the requisite particular intent, for, it is said, the "record is wholly deficient in evidence  *  *  *  to establish beyond a reasonable doubt that Woodworth and Brown had committed a robbery." This is predicated upon the assertion that the evidence reasonably tends to show these defendants were merely guilty of assault and battery growing out of an industrial dispute in which they were participants.

But it was open to the jury to find, as they undoubtedly did find, that this defense was wholly sham—devised to escape the consequences of the major crime. Woodworth and Panchelly admitted that in the darkness of night they accosted Schwartz, a stranger, while he was walking on River Street in Hoboken, on the way to his brother's home. They inquired whether he was a seaman, and he replied in the affirmative, so they said. Woodworth testified thus: "We said we were seamen and we were off a boat and asked him if he was off a boat and he said he was off the sea train running to Florida; so we asked him if there was a chance for a job on it, that we were out of a job, and he said 'yes, I can get you a job on there.' He said, 'come on;' so when he asked me to be a scab again—well, I just—all three of us hit him. We did beat him up.  *  *  *  After beating him up we started walking down the street." On cross-examination, he gave a somewhat different version of the altercation: "*Q*. And you beat him? *A*. After he offered me to get a job—offered me a job on a ship when there was a strike going on." Panchelly's testimony was essentially the same. Schwartz, on the other hand, testified that he was asked if he was a seaman, and replied: "No, I am a longshoreman;" that he was immediately "punched, or  *  *  *  hit  *  *  *  with something;" that he fell to the ground, whereupon they "rolled" him "around" until he lost consciousness. Disinterested witnesses who came upon the scene testified that, while Woodworth and Brown continued to kick Schwartz in the head and face, Panchelly stripped him of his "lumber jacket," put it "on himself and  *  *  *  his own jacket on top of that;"

whereupon the three left the scene together, but were intercepted a short distance away by police officers, when, in an effort to escape, Panchelly ran in one direction and Woodworth and Brown in another. To corral them, it was necessary for the police officers to use physical force on one and to threaten to shoot the other two. These witnesses included Joseph Loori, a member of the bar of this state, and Paul Spanolia, an agency supervisor for a life insurance company which maintained an office on River Street. Their testimony tended to establish concert of action in execution of a common design to perpetrate a robbery. The concealment of the jacket is unmistakably indicative of a purpose, common to all three, to escape with the loot.

At the police station, to which plaintiffs in error were immediately taken, it was discovered that Panchelly was wearing Schwartz's jacket, "up side down" beneath his overcoat. A set of keys attached to a disc bearing Schwartz's name, his pen knife, and $1.80, were found in the right-hand pocket of overalls worn by Panchelly. A search of Schwartz's person, and the jacket found on Panchelly, disclosed no money; nor was any money found on the person of either Woodworth or Brown. Schwartz testified that, when he was thus assailed, there were two ten dollar bills in one pocket of his jacket and $1.80 in the other, and that the keys and knife were in a pocket of his trousers. He made these facts known immediately upon arrival at the police station.

It is pointed out that plaintiffs in error were striking seamen assigned to picket duty; and the argument is made that, under all the circumstances, their version is the more probable one, while Schwartz's relation of the happening is incredible. It is said that Schwartz's story is "extremely fanciful," and that he was "obviously motivated by a desire to revenge himself for a bad beating which he admittedly received." Our consideration of the evidence leads us to the converse of that proposition. The credibility of Schwartz was in nowise impeached. On the other hand, each of plaintiffs in error has a criminal record. In 1933 Woodworth was convicted of forgery in California. In the same year, Brown was con-

victed in that state of carrying a concealed weapon. Pan-chelly, whose true name is Joseph Mignoe, was convicted of burglary in 1909; larceny in 1916, and again in 1919; and breaking and entering and larceny in 1930. Twenty-six days before the occurrence in question, they had disembarked from the steamship *"President Polk"* to participate in the seamen's strike on the eastern seaboard. They were destitute of means, and were dependent upon the union for food. Although with-out funds, they testified that, immediately before the attack, they spent some time drinking in a tavern nearby. In this con-nection, it is to be observed that the evidence overwhelmingly establishes that they were sober at the time. Schwartz was not a strikebreaker and was not identified with the seamen's strike. On the contrary, he was a member in good standing of the long-shoremen's union. There is plainly no merit in the contention of plaintiffs in error that the weight of the evidence "supports the view that the fight ensued as the result of" Schwartz's "efforts to induce the defendants to become strike-breakers." In order to sustain this claim, they are put to the necessity of attacking the credibility not only of Schwartz, a lifelong resi-dent of Hoboken, and the police officers who arrested and searched the accused, but of challenging the "accuracy of recollection" of the witness Loori.

It was for the jury to determine whether the evidence demonstrated guilt beyond a reasonable doubt; and the rule is firmly established in our jurisprudence that a verdict is not to be set aside on error as against the weight of the evi-dence, under chapter 349 of the laws of 1921 (*Pamph. L., p.* 951; *Rev. Stat.* 1937, 2:195-19), unless it clearly appears that it is the product of mistake, passion, prejudice, or par-tiality. Under our system of jurisprudence, the function of determining whether the guilt of the accused has been estab-lished beyond a reasonable doubt rests with the jury. Having the opportunity of observation of the witnesses, and their demeanor while testifying, they are in a better position to judge of their credibility and the weight to be accorded to their testimony. The statutory authority thus to review the evidence was designed to correct injustice resulting from a

plain and obvious failure of the jury to function within its allotted sphere. The test is not whether the minds of the reviewing judges are also satisfied of guilt beyond a reasonable doubt. *State* v. *Hauptmann,* 115 *N. J. L.* 412, 443; *State* v. *Karpowitz,* 98 *Id.* 546; *State* v. *Tomaini, supra.*

And, if we were at liberty to apply the standard governing the jury, the result would not be different. The swiftness and fury of the conceded attack bespeak a definite preconceived purpose, not hot blood engendered by an unanticipated controversy growing out of the industrial conflict. And what could that purpose be, if not robbery? In the absence of irrationality, human behavior out of the normal course ordinarily springs from a particular motive. There is no rational explanation of the conduct of these plaintiffs in error consistent with the absence of an intent to perpetrate a robbery.

Judgment affirmed.