STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. EUGENE MONAHAN, DEFENDANT-APPELLANT, AND MICHAEL MONAHAN, DEFENDANT.

Argued June 14, 1954—Decided June 28, 1954.

84

*Mr. George L. Feasler* argued the cause for appellant (*Mr. William P. Elliott*, attorney).

*Mr. Chester A. Weidenburner*, Assistant Prosecutor, argued the cause for the State (*Mr. H. Russell Morss, Jr.*, County Prosecutor, attorney).

The opinion of the court was delivered by

WACHENFELD, J.   Eugene Monahan and Michael, his 15-year-old son, were charged with murder in two indictments returned in Union County.   A motion for severance of the defendants for trial was made and granted by the court. We subsequently decided jurisdiction as to Michael was in the Juvenile and Domestic Relations Court.  See *State v. Monahan*, 15 *N. J.* 34 (1954).

The two indictments against Eugene Monahan were consolidated for trial.   The State's case was based upon the theory that the defendant Eugene Monahan perpetrated or attempted to perpetrate a robbery in the course of which two men were shot and killed.

The crime occurred on March 7, 1953.   The appellant, 44 years old, drove his son Michael to Elizabeth from their home in Vaux Hall, Union, New Jersey.   Michael, who apparently had been in trouble with the police before, went to the court house to report to his probation officer, while his father went to the Shamrock Bar and Grill, 12 South Broad Street, Elizabeth, where his son joined him at about ten o'clock in the morning.

After drinking some beer, the appellant sent his son to the car for a Luger automatic pistol which was in the glove compartment.   When Michael returned, the two or three customers who had been there had left and no one else was in the bar except his father and the bartender.   Michael gave his father the Luger in the men's room, and when they returned to the bar, he locked the front door on his father's

instruction. The appellant drew the pistol, said, "This is a stick-up," and then fired at the bartender, Sebastian Weilandics, who ran from behind the bar toward the back door of the premises, where he collapsed. He had been shot four times in the chest, death resulting from a hemothorax perforation of the lung.

As the Monahans started for the front door, a customer, William Diskin, was attempting to enter. The appellant unlocked the door and let him in. Diskin looked directly at Eugene Monahan, who, according to his own version, realizing he would later be thus identified, drew the Luger from his coat pocket and shot Diskin three times, twice in the back and once in the chest. Death was caused by a perforation of the heart, lung and liver, hemoperitoneum and hemothorax.

After the shooting, Eugene and Michael left the tavern, got in their car and drove around the block. Observing there was no commotion at the scene of the crime and assuming it had not yet been discovered, the appellant stopped the car, went back into the tavern, vaulted the bar and took the receipts out of the cash register, amounting to $53.25.

Returning to the car, he circled the block again, this time noticing a large crowd gathered in front of the tavern. Then he drove to the family home in Vaux Hall, after first stopping for gas.

The Luger was concealed in the cellar for a few days, after which Michael Monahan destroyed it with a sledge hammer in compliance with his father's instructions. The broken parts were thrown into the Passaic River.

The police authorities apprehended the Monahans about six weeks later after they had been arrested in connection with another crime in Essex County, when Michael for the first time informed the authorities what had taken place at the tavern in question.

. Most of the facts outlined are taken from a statement made by the appellant, but there is a considerable amount of confusion and contradiction because the statements made by the son vary to a substantial extent.

Michael first said, in two different statements, that he did the shooting and took the money from the cash register. However, he later made a third statement, Exhibit S-68, one of the subjects of controversy hereafter discussed, in which he said the shooting was done by his father and that he had previously admitted doing it "because of the fact I wanted to protect my father."

The main defense was insanity. The appellant was found guilty of murder in the first degree on each of the two indictments and was accordingly sentenced to death.

Six points are raised on appeal and will be dealt with in order of their presentation.

During the direct examination of a witness, Detective Englehart, in order to present some of the evidence required, the prosecutor turned to Lt. Jury, who was not a witness, and took from him two envelopes, one containing a piece of metal found by Englehart and the other, two 9 mm. discharged shells that had been handed over by the witness, at which time Lt. Jury described the articles in question.

It is contended this was prejudicial procedure, but on oral argument the point was specifically abandoned and will not therefore be further considered.

The next issue presented involves the admission of Exhibit S-68 and a denial of a motion on behalf of the appellant to expunge the same exhibit.

It is referred to by the appellant as the statement of Michael Monahan, and the contention is its admission into evidence was prejudicial error in that it violated the best evidence rule and the provisions of the Constitution of the State and of the United States. The statement was primarily made by Michael but it was signed on each page by his father. Appended to it was the appellant's sworn statement that it was read to him and that every word was true.

All the cases submitted by the appellant are urged upon us with an eye to analogizing Exhibit S-68 to a statement not made by a defendant himself but by someone else, for which reason it is not admissible in evidence. The sug-

gestion is that the appellant's right of cross examination was eliminated because the author of the statement was not produced as a witness.

█ The factual manner in which the issue is presented would at first blush seem to give the thought some merit, but viewed in the light of the complete record, the procedure did not constitute reversible error.

Exhibit S-68 consists of four typewritten pages, signed on each page by the son and the appellant, and at the end of the statement, in addition to the boy's witnessed signature, there is a statement by his father as follows:

"I, Eugene Monahan, was present when my son made the above statement. I heard him make the above statement of his own free will without any threats or promises being made to him by anyone. I also say that this statement was read to my son and myself in each other's presence and every word of it is true.
                                        Eugene F. Monahan
Witness:   J. Hemmingway
              Frank S. Paul, Jr.
Sworn and subscribed to before me this 17th day of April, 1953.
Louis J. Martel, Notary Public of New Jersey"

On the first, second and third pages, at the bottom of each page, appear the signatures of "Michael Monahan" and "Eugene F. Monahan."

Even unsigned statements in many instances are properly admitted in evidence. A lengthy review of the cases so holding is contained in *State v. Cleveland*, 6 *N. J.* 316 (1951), where this court was concerned with the question as to whether or not a voluntary statement made by the defendant but not shown or read to him nor signed or acknowledged by him was admissible in evidence. The cases are marshalled and commented upon extensively, the conclusion being that an unsigned statement may be admitted in evidence if it is acknowledged, as in *State v. Lustberg*, 11 *N. J. Misc.* 51 (*Sup. Ct.* 1933); *State v. Donato*, 106 *N. J. L.* 397 (*E. & A.* 1930); and *State v. Foulds*, 127 *N. J. L.* 336 (*E. & A.* 1941).

The rule is clearly spelled out in these cases that until the statement is signed or its correctness acknowledged in some fashion by the defendant, it constitutes merely a memorandum of what was said and is inadmissible. In such situations the State is limited to the oral testimony of the witnesses who were present when the statement was made. The State may, for the purpose of refreshing the witnesses' recollection, when necessary, refer to notes made at the time by them or under their supervision, but where the transcribed statement is not read by or to the accused and he does not sign it or otherwise acknowledge its correctness, the oral testimony of the witness and not the transcript is the only admissible evidence. The statement itself is not admissible.

Here, however, the statement in substance is the appellant's own statement and derives force from the admission of the prisoner himself of the inculpatory concessions. It was signed by him in three different places and acknowledged by him in writing to be accurate and "every word of it is true."

This method of taking dual statements may easily lead to unsustainable abuses and is not to be encouraged, but here under the particular circumstances it provides no ground for reversal. The admission of the statement was not error.

Under Point 3 it is argued by the appellant there was no proof of robbery or attempted robbery sufficient to sustain a conviction of murder under the indictments, which, of course, would be murder in the first degree. This proof being lacking, the killing would under our law be presumed to be murder in the second degree, under *State v. Tansimore,* 3 *N. J.* 516 (1950).

The factual argument advanced seeks to show absence of proof to support the crime of robbery, but this interpretation of the facts is wholly without merit. There was evidence of robbery offered by the appellant's own case, Exhibit D-24, in which the son said, amongst other things: "I figured my father was going to hold the place up, because he used

to talk about places he held up  *  *  *" and "*  *  *  I hesitated again and asked my father what we were going to do and he said we are going to stick the place up.  He said go in there and kill the bartender and take the money."

Similar statements were contained in Exhibit D-23, another statement by Michael, also offered by the appellant.  Further, in Exhibit S-66, the appellant's own statement, concerning which there is no controversy, the following appears:

"I told Michael while we were in the Shamrock Bar on March 7, 1953 in the morning to go over and get the Luger out of the glove compartment.  The reason I did this was because I was going to stick up the bartender and rob the money in the tavern."

Also, in reenacting the crime in the presence of the county prosecutor's men, the appellant graphically depicted the details of the robbery.

In addition to this evidence, the Monahans' presence at the scene of the crime and many other details were amply supported by testimony of other witnesses.

The record supplied the proof and the question was for the jury.

Under Point 4 it is urged error was committed in excluding the testimony of the appellant's mother, but the particular rulings relied upon are not stated in the brief nor specifically called to our attention.  Examination of the record indicates the only question asked, objected to and sustained, related to what school the appellant last attended.

██ The question, we think, should have been permitted to supply the background on the defense of insanity, but we see nothing prejudicial in its exclusion because it was testified to completely by many other witnesses.  Elmer McGinnis, special investigator for the Newark Board of Education, produced the appellant's complete record of attendance in Newark schools, which was marked in evidence.  And both Dr. Collins and Dr. Colley, psychiatrists appearing on Monahan's behalf, testified fully as to his attending a public school in East Orange and that he went to school in Newark

until he reached the fifth or sixth grade at the age of 15. The same facts were brought out by Dr. Kinley, a state witness.

This seems to have been the full information that could have been elicited from the prisoner's mother if the question in controversy had been permitted. We therefore see no error.

Next and the most important point is the appellant's contention that the defense proved insanity by a preponderance of the evidence. It is conceded that sanity is presumed and the defense of insanity is an affirmative one which must be established by the accused by a preponderance of proof. *State v. Molnar*, 133 *N. J. L.* 327 (*E. & A.* 1945); *State v. Cordasco*, 2 *N. J.* 189 (1949).

Counsel likewise admits that the extent and character of the insanity which constitutes defense against a criminal charge must be such as to render the accused incapable of distinguishing between right and wrong at the time of and in respect to the act committed. *State v. Noel*, 102 *N. J. L.* 659 (*E. & A.* 1926); *State v. Lynch*, 130 *N. J. L.* 253 (*E. & A.* 1943); *State v. Cordasco, supra.*

He contends, however, the defense in accord with these principles was proven by a preponderance of the evidence that the defendant was legally insane.

Five psychiatrists in all testified in this case, three of them for the appellant and two for the State. Dr. Colley, Dr. Collins and Dr. Spradley all appeared for the defense and all with varying degrees of certainty testified Eugene Monahan was suffering from schizophrenia, "which is another name for dementia praecox:" that he was unable to know the nature and quality of his act and to distinguish right from wrong.

But Dr. Kinley for the State unequivocally testified that in his opinion the appellant was "capable of distinguishing right from wrong," although he felt the man was a schizophrenic. Dr. Robie testified for the State also with unusual firmness:

"Q. Will you tell us what your opinion was in that regard? A. There is not the slightest question in my mind but that Eugene Monahan definitely knows how to distinguish between right and wrong."

Buttressing the testimony of these experts was the evidence in the form of the opinion of five lay witnesses, all of whom observed the prisoner while he was incarcerated in the Union County jail between the time of his apprehension and trial. Generally they testified that during this period he had not acted differently from any other prisoner, that he read papers, magazines and the Bible, listened to the radio, played cards, did not shun the company of other prisoners, and exhibited no abnormal conduct.

■ This testimony corroborates the medical evidence submitted on behalf of the State. Although it comes from prison guards, the jury have a right to take it into consideration and decide the weight to be given it in reaching their conclusion.

■ According to the law as established in our jurisdiction by many decisions, we are not justified in concluding the jury's verdict should be otherwise than as recorded unless we determine it was the result of mistake, passion, prejudice or partiality. *State v. Woodworth,* 121 *N. J. L.* 78 (*Sup. Ct.* 1938); *State v. Friedman,* 135 *N. J. L.* 419 (*Sup. Ct.* 1947); *State v. Ruth,* 136 *N. J. L.* 63 (*Sup. Ct.* 1947); *State v. Pierce,* 4 *N. J.* 252 (1950); *State v. Goodman,* 9 *N. J.* 569 (1952); *State v. Peterson,* 10 *N. J.* 155 (1952); *State v. Cooper,* 10 *N. J.* 532 (1952); *R. R.* 1:5–1.

■ Under our system of jurisprudence, the responsibility of determining if the guilt of the defendant has been established beyond a reasonable doubt rests with the jury and our review of the evidence is designed only to correct injustice resulting from a plain and obvious failure of the jury to perform its function. *State v. Woodworth, supra.*

■ The question of conflicting testimony was admirably and fully presented for the jury's determination by the trial court's charge:

"There is a conflict of medical testimony, and you will have to determine where the truth lies. You are the judges of the credibility of the medical witnesses—and the phychiatrists—and the weight to be attached to their testimony. You saw and you heard them, and you had the opportunity to observe their attitude and demeanor on the witness stand. You had the opportunity to hear their means of obtaining knowledge of the facts and to notice their power of discernment, their candor or evasion, if any, and their qualifications and background. These may all be considered by you in determining the credibility of this expert testimony."

Thus the issue was squarely, intelligently and impressively left to the jury, whose verdict is supported by the record.

The Court of Errors and Appeals, in *State v. Deegan*, 133 *N. J. L.* 263 (*E. & A.* 1945), encountered a strikingly similar problem and disposed of it in a manner with which we are in complete accord:

"The testimony conclusively established defendant's guilt, unless his defense of insanity prevailed. Upon this point there was testimony of lay witnesses and expert medical witnesses for both the State and defendant. A question of fact was raised on this point and the jury had ample evidence to warrant the verdict of guilty."

Our view affirms the result reached and we see no failure of plain, fundamental justice requiring our intervention.

Lastly it is insisted the court failed to charge certain requests relating to second-degree murder, and in substance the suggestion is there was error in limiting the jury to the alternative verdicts of murder in the first degree or acquittal.

Our stamp of approval on such procedure was affixed in *State v. Grillo*, 11 *N. J.* 173 (1952), where we said:

"The precise question has been determined adversely to these defendants' contentions in *State v. Bunk*, 4 *N. J.* 461, 474, 475 (1950), *certiorari* denied 340 *U. S.* 839, 71 *S. Ct.* 25, 95 *L. Ed.* 615 (1950). And it is firmly settled in our law that such a charge, directing the jury to bring in a verdict either of guilty of murder in the first degree or of acquittal is not error under circumstances such as exist in this case. See, for example, *State v. Young*, 67 *N. J. L.* 223, [233] (*E. & A.* 1902) ; *State v. Palmieri*, 93 *N. J. L.* 195 (*E. & A.* 1919) ; *State v. Martin*, 94 *N. J. L.* 139 (*E. & A.* 1920) ; *State*

*v. James*, 96 *N. J. L.* 132 (*E. & A.* 1921) ; *State. v. Carlino*, 98 *N. J. L.* 48 (*Sup. Ct.* 1922), affirmed 99 *N. J. L.* 292 (*E. & A.* 1923)."

The judgment of conviction below is affirmed.

HEHER, J. (dissenting). I hold the view that on the issue of insanity the verdict is contrary to the weight of the evidence. Insanity is an affirmative defense, to be proved by a preponderance of the evidence, and the proofs here would seem to satisfy that standard.

Dr. Colley and Dr. Spradley, physicians specializing in neurology and psychiatry, both in the state service, assigned to the accused by the court in compliance with a request of his counsel for informed professional aid and assistance in relation to the defense of insanity, and Dr. Collins, long a physician and specialist in the same field, who examined the accused as the representative of the State, but was called as a witness on his behalf, all testified that he was afflicted with dementia praecox, of the paranoid type, more lately class-ified as schizophrenia, a major adolescent psychosis, and was incapable of differentiating right from wrong and of comprehending the nature and quality of his acts at the time of the fatalities made the subject of the indictment.

Dr. Kinley, a physician and specialist in neuropsychiatry, called as a witness by the State, agreed that the accused was a schizophrenic, but he was of the opinion that on March 7, 1953, the time of the homicidal act, he knew "the nature and quality of his acts" and the "difference between right and wrong" although he conceded that the following June he "had a fixed opinion that the defendant was not able to confer with his counsel." Dr. Robie, the second specialist in psychiatry called by the State, classified the accused as a "psychopathic personality" or a "constitutional psycho-pathic inferior," but capable of distinguishing between right and wrong.

And in 1937, while confined in the State Prison at Tren-ton under a sentence for crime, Dr. Paul B. Means found

that he was a psychopathic personality and a constitutional defective.

All the standard works on mental diseases define schizophrenia as a form of insanity which has its inception in puberty or adolescence, usually with a hereditary background, and is attended by a mental or physical lack of potentiality for development; the individual is "stranded on the rock of puberty." The paranoid form is the worst of a progressive dementia.

Against this specialized opinion the lay opinion of his jailkeepers can have little or no significance on the inquiry of criminal accountability.

I shall not go into the evidence. It suffices to say that the proofs indicate a conforming behavior pattern.

And, apropos of this, there was an undue exclusion of testimony from the accused's mother concerning his early history and psychological background relevant to the inquiry of the existence of a schizophrenic or manic-depressive psychosis.

Criminal responsibility is of the very essence of punitive measures. Confinement is the means of society's protection against a dangerous lunatic, as well as the care of the victim.

I would reverse the judgment.

*For affirmance*—Chief Justice VANDERBILT, and Justices OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—6.

*For reversal*—Justice HEHER—1.