COMMONWEALTH *vs.* LEWIS H. DICKERSON.

Suffolk.   November 1, 1976. — June 20, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Homicide. Identification.  Search and Seizure.  Practice, Criminal,* Examination of jurors, Charge to jury, Verdict.  *Jury and Jurors.*

Limitation by the judge at a murder trial of defense counsel's examination concerning the number and description of persons present at a hospital identification of the defendant required this court to examine the case as a one-on-one confrontation. [787-790]

There was no error in the denial of a motion to suppress on out-of-court identification of the defendant while he was being treated at a hospital for gunshot wounds shortly after the crime where the confrontation took place in the immediate aftermath of the crime as part of reasonable police investigation of the crime and where the witness had previously given the police a description of the assailant within a short time of the incident [790-791]; nor was there error in the denial of a motion to suppress an identification of the defendant by the witness at a probable cause hearing [790-791].

Commonwealth *v.* Dickerson.

There was no error in the denial of a motion to suppress clothing seized
    from the defendant where the seizure was incident to a valid arrest
    and was evidence of the crime for which the arrest had been made.
    [791-792]
The judge in a criminal case did not abuse his discretion in excusing
    a juror after the defendant had declared himself content with the
    panel. [792-795]
At the trial of an indictment charging murder in the first degree, even
    though the judge's charge to the jury was incorrect in his statement
    of circumstances which they might consider in reducing a felony
    murder to murder in the second degree, the error was harmless be-
    yond a reasonable doubt where the charge was more favorable to the
    defendant than that to which he was entitled. [795-798] QUIRICO, J.,
    concurring. BRAUCHER, J., concurring in the result, with whom KAP-
    LAN, J., joined.

INDICTMENTS found and returned in the Superior Court
on April 17, 1975.

The cases were tried before *Roy*, J.

*Maurice F. Ford* for the defendant.

*Robert J. McKenna, Jr.*, Assistant District Attorney,
for the Commonwealth.

HENNESSEY, C.J.    The defendant brings this appeal
under G. L. c. 278, §§ 33A-33G, from his convictions on
indictments charging murder in the first degree, armed
robbery, and unlawfully carrying a handgun on his person.
He was sentenced to two concurrent life sentences to be
served at the Massachusetts Correctional Institution at
Walpole on the murder and armed robbery convictions and
to an additional concurrent sentence of two and one-half
to three years on the handgun possession conviction.

The defendant raises the following issues in this appeal:
(1) whether, during a voir dire hearing on the defendant's
motion to suppress in-court and out-of-court identifica-
tions, the judge erred in excluding examination of wit-
nesses with respect to other persons who were in the area
in which the defendant was identified; (2) whether the
judge erred in denying the defendant's motion to suppress
identification and to suppress clothing seized in the de-
fendant's presence without a warrant; (3) whether the
judge erred in excluding a juror on his own motion; and
(4) whether the judge erred in charging with respect to

factors which the jury might consider in making their determination as to whether the offense constituted murder in the first or second degree.

We conclude that there was no error as to issues (1), (2), and (3) above. As to issue (4), we conclude that there was error, but it was harmless beyond a reasonable doubt. Consequently, we affirm the judgments.

We summarize the evidence presented. The incident in question occurred on February 7, 1975, at Cy's Variety & Package Store in Dorchester. Present in the store that evening were Cyril Miller, the owner of the store, and Eva Dodds, a friend who was assisting him as a clerk. At the rear of the store was a beer chest above which was a loft area in which was located a four-inch square peephole through which the front area of the store could be observed.

Miller stationed himself in the loft area at approximately 5 P.M. on the day in question while Dodds remained on duty in the front of the store. About 10:30 P.M. Miller heard someone ask Dodds for a pint of Wild Irish Rose wine. About a minute later he heard a voice say loudly, "All right. Give up the cash. Give it up." Miller immediately looked through the peephole and observed two men in the store. He saw one man, wearing a green army jacket with a poncho hood which obscured his face, taking the cash from the register, an estimated $752.10. The second man, described by Miller as a light-skinned black man, five feet eight inches tall with a moustache and small beard and wearing a dark blue or black coat and a knit cap and subsequently identified by Miller as the defendant, was standing across a counter from Dodds pointing a gun at her chest. He observed the defendant through the peephole for half a minute to one minute while reaching for a shotgun which he kept in the loft. As he turned away to grab the gun, he heard a shot. He heard Dodds scream and immediately thrust his shotgun through the peephole and fired. He was unsure whether he had hit anyone, but he subsequently found some torn lining from a blue nylon jacket caught in a wire mesh

grating in the wall, behind which were imbedded several shotgun pellets. Miller then left the peephole, and the men fled. Dodds died as a result of a gunshot wound of the chest.

The Boston police arrived at the scene within a few minutes, and Miller gave them the description of the two men as above. Officer Patrick Maloney broadcast the description, including information that one of the men may have been suffering from gunshot wounds. Shortly thereafter, about 11:30 P.M., Maloney received a report from a police detective that a man suffering gunshot wounds had admitted himself to Boston City Hospital. Maloney and his partner Detective Tower went immediately to the hospital and learned that two men, one white and one black, had recently been admitted for treatment of gunshot wounds. Hospital records indicated that the defendant was admitted at 10:50 P.M. suffering from multiple gunshot wounds of the left shoulder.

Miller was brought to the hospital by another police officer about midnight. He was accompanied by Maloney and Tower to the Shortell Unit, a holding area for the X-ray unit, where the defendant, the black man who had admitted himself for treatment of gunshot wounds, had been taken. Miller identified the defendant as the man who had shot Eva Dodds. We will discuss the identification procedure in greater detail in connection with our discussion of the issues raised by the defendant with regard to his motion to suppress identification.

The defendant was placed under arrest immediately following the identification. During questioning which followed the giving of Miranda warnings and the defendant's expression of willingness to talk, Maloney seized as evidence a bag found at the foot of the defendant's bed which contained the clothing he was wearing at the time of his admission to the hospital. In the bag was, among other items of apparel, a blue nylon jacket with shredded padding in the area of the wound. Subsequent microscopic analysis indicated that the padding of the jacket matched the shreds of padding found at the store.

The defense was one of alibi. The defendant was employed full time at an auto body shop at a wage of approximately $170 a week. He worked on the day of the crimes and was paid approximately $125 after taxes. The defendant testified that he went shopping after work and then stopped and had a few beers. He was walking to his girl friend's house around 10 or 10:30 P.M. when he saw a fight in progress on the street and stopped to watch. He testified that one of the men involved in the fight got a gun and fired several shots, one of which hit the defendant. He was driven to the hospital by a woman with whom he was slightly acquainted who had emerged from a nearby store.

1. *The identification issues.* We first discuss the circumstances in which the defendant was identified by Miller, as developed in the course of the voir dire hearing held by the trial judge on the defendant's motion to suppress. When Miller arrived at the hospital, he was accompanied by Maloney and Tower to the Shortell Unit. Maloney told Miller that they were taking him to a room in which there was a man who had been admitted for treatment of gunshot wounds. He asked Miller to enter the room alone and look at the patients without saying anything while in the room and then to return and tell him whether he could identify anyone. The officers waited outside the room.

At the time Miller entered the room, there were approximately five to seven patients lying in beds all wearing hospital johnnies and covered with sheets. Maloney testified during voir dire that he remembered seeing one other black patient in the room. Miller testified that there may have been three or four black men. It was not possible to tell on visual observation of the men in the room which of them was suffering from gunshot wounds.

The defendant was lying on a bed on the left side of the room. Miller looked around, and observed the defendant. He returned outside to the officers and told them that he thought he had seen the man. Maloney told Miller that he had to be sure of his identification, whereupon Ma-

loney and Miller entered the room together. Miller went with the officer to the defendant's bed, walked around it looking at the defendant, and then told Maloney that he was sure that the defendant was the man he had shot at in his store.

The defendant was also identified by Miller at the defendant's probable cause hearing when the defendant was standing alone in the dock. The probable cause hearing had been continued from its initially scheduled date when the judge granted the defendant's request for an in-court lineup. Defense counsel undertook to make the necessary arrangements for a lineup on the continued date. When the probable cause hearing was held, no lineup was conducted because the arrangements had not been made and because there were insufficient people in the court room on the date of the hearing to make a lineup possible.

The defendant moved prior to trial to suppress the out-of-court and in-court identifications. The judge denied the motion, making his findings on the record. He apparently assumed that the confrontation in question was a one-on-one showup, but he denied the motion based on his findings that there was nothing coercive or suggestive in the procedures employed by the police.

The defendant raises two issues with regard to the denial of the motion to suppress identification: (1) whether the judge erred in limiting the scope of examination during the voir dire hearing, and (2) whether the confrontations were so suggestive as to constitute a violation of due process. We find no reversible error.

Even considering the broad discretion permitted the judge in controlling the scope of cross-examination, we see no good reason here for the judge's limitation of examination related to circumstances surrounding the hospital confrontation. Defense counsel attempted to examine witnesses with respect to the number and descriptions of people in the hospital at the time of the confrontation and in the area of the confrontation, both in the long corridor leading to the room and in the room itself, but he was denied such opportunity beyond establishing the limited

information that there were five to seven other patients in the room, one or more of whom were black. The judge also limited exploration of how closely Miller had looked at the other people in the room.

Since eyewitness identification often plays a major, if not a determinative, role in the trial of criminal offenses, and the dangers of mistaken identification are great and the result possibly tragic, defendants must be allowed to examine fully during the voir dire hearing the *totality* of circumstances, and certainly the presence and description of other persons in the area is an important circumstance. In a case suggestive of unfairness in the confrontation process, failure to allow full development of the circumstances surrounding the identification might well warrant setting aside the verdict of guilt.

Nevertheless the limitations imposed by the judge in this case are not fatal, because, even taken as a one-on-one confrontation, the entire identification process was of a type and in circumstances which we have repeatedly upheld as free from the elements of unfairness which warrant suppression of the evidence. The judge's refusal to allow full examination of witnesses during the voir dire hearing with respect to descriptions of other persons who were present in the area in which the confrontations occurred leaves this court with no fair alternative other than to examine the case on a one-on-one basis.

We reiterate our general disapproval of one-on-one confrontations. See *Commonwealth* v. *Barnett,* 371 Mass. 87 (1976), cert. denied, 429 U.S. 1049 (1977). However, "a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it." *Stovall* v. *Denno,* 388 U.S. 293, 302 (1967). The identification at the hospital is governed by our recent holding in *Commonwealth* v. *Barnett, supra.*

The confrontation in *Barnett* also took place in a hospital setting. The witness and the defendant had both been wounded in the incident and both were taken to the same hospital. After emergency treatment was rendered to both, police officers arranged to have the witness's litter

placed next to that of the defendant without informing the witness of the impending confrontation, and the witness immediately identified the defendant as the man who had shot him.

We stated in *Barnett, supra* at 91-92: "A 'one-on-one' confrontation with a person in custody is disfavored generally as a basis of identification ... but such showups of suspects to eyewitnesses of crimes have been regularly held permissible when conducted by the police promptly after the criminal event. Of course, where the circumstances are so exigent as to exclude waiting to arrange a lineup, the case is very clear .... Exigent or special circumstances, however, are not prerequisite.... [T]he police procedure of arranging these showups is recognized as usual and natural and justified by the need for efficient investigation in the immediate aftermath of crime.... To have the witness view the suspect while his recollection or mental image of the offender is still fresh, before other images crowd in or his attempts to verbalize his impressions can themselves distort the original picture, provides the witness with good opportunity for an accurate identification.... The general view that such speedy confrontations are permissible is accepted in this jurisdiction and elsewhere."

In the case now before us, as in *Barnett*, there was a danger that the hospital setting of the confrontation was inherently suggestive, but there are other factors which override the possible suggestiveness of the setting. Two factors to which we have given great weight are that the confrontation took place in the immediate aftermath of the crime as part of reasonable police investigation of the crime, see *Commonwealth* v. *Barnett, supra*; *Commonwealth* v. *Denault*, 362 Mass. 564, 566 (1972); *Commonwealth* v. *Leaster*, 362 Mass. 407, 411 (1972); *Commonwealth* v. *Connolly*, 356 Mass. 617, 624 (1970); *Commonwealth* v. *Bumpus*, 354 Mass. 494, 501 (1968), cert. denied, 393 U.S. 1034 (1969), and that the witness had previously given the police a description of the assailant within a short time of the incident, see *Commonwealth*

v. *Denault, supra; Commonwealth* v. *Leaster, supra; Commonwealth* v. *Bumpus, supra* at 500; cf. *Commonwealth* v. *Barnett, supra* at 93. Both of these factors are present in this case and mitigate the suggestiveness of the hospital confrontation. Miller had an opportunity to observe the assailant in circumstances in which there was no direct threat to himself and gave police a general description of the assailant within minutes of the crime, a description which fit the defendant. The hospital confrontation occurred within two hours of the crime, and the police had information indicating that the suspect was fully ambulatory and in fact that his injuries were not even so serious as to have required immediate medical attention.

The police took steps to minimize the suggestiveness of the setting: the defendant was not taken into custody until after the identification, they did not point out to Miller the man suffering from gunshot wounds among the five to seven patients in the room, and they initially sent Miller into the room alone to view the patients. While we cannot agree with the finding of the judge that there was no suggestiveness in this confrontation, we find that the confrontation was in the totality of circumstances not so unnecessarily suggestive and conducive to irreparable mistaken identification as to deny due process of law.

The identification by Miller of the defendant at the probable cause hearing was not tainted by the fact that the defendant was alone in the dock. The critical role which identification often plays in such proceedings is such that we would encourage the use of lineups. However, the use of lineups in that context is not constitutionally mandated. The record in this case indicates that defense counsel was afforded an opportunity to arrange a lineup and failed to do so.

We conclude that the two out-of-court identifications were admissible at trial, as was the in-court identification, since it was not based on a prior impermissibly suggestive confrontation. See *Commonwealth* v. *Botelho,* 369 Mass. 860, 867 (1976).

The defendant also moved to suppress the clothing

Commonwealth *v.* Dickerson.

taken from the foot of his bed after his arrest. We conclude that the arrest was valid and based on probable cause. The seizure of the clothing, while warrantless, was incident to a valid arrest and was "evidence of the crime for which the arrest... [had] been made." G. L. c. 276, § 1, as amended by St. 1974, c. 508.

2. *The jury selection issue.* The defendant next argues that the judge erred in excusing a prospective juror on his own motion. The judge excused Dorothea Ryan after the defendant had announced himself content with the panel but before the jury were sworn. The colloquy between the judge and juror Ryan is set out in its entirety in the margin.[1]

The defendant first argues that prior to excusing juror Ryan the judge failed to make the examination of the juror required by G. L. c. 234, § 28, as amended by St. 1975, c. 335, which provides in part: "For the purpose of determining whether a juror stands indifferent in the case, if it appears that, as a result of the impact of considera-

---

[1] THE CLERK: "Juror No. 276, Dorothea D. Ryan, Seat No. 14." THE JUDGE: "Miss Ryan, did you hear the questions that I put to the other jurors?" (The prospective juror nodded affirmatively.) THE JUDGE: "Do they affect you in any way whatsoever?" THE JUROR: "No." THE JUDGE: "Read this question, if you will." (Juror reading exhibit A.) THE JUROR: "No." THE JUDGE: "You may take Seat No. 14." (Juror seated.) COUNSEL FOR THE DEFENDANT: "The defendant is content." THE JUDGE: "Have the court officer come up for a moment." (Court officer Rosen at bench.) THE JUDGE: "Was there some indication from one of the jurors about the death penalty?" COURT OFFICER ROSEN: "I think Juror No. 14." THE JUDGE: "That's Mrs. Ryan. Come up." (Juror Ryan at bench.) THE JUROR: "I don't want to cause any trouble so I thought I should state my views. I am strongly against the death penalty." THE JUDGE: "What concern is that in ..." THE JUROR: "I thought if ..." THE JUDGE: "The death penalty is outlawed in Massachusetts, in any event." THE JUROR: "I'm sorry." THE JUDGE: "The question of innocence or guilt hasn't got anything to do with the punishment. You are excused." THE CLERK: "No. 276, Dorothea Ryan, you are excused by order of the Court." COUNSEL FOR THE DEFENDANT: "Your Honor, the defendant takes exceptions to that." THE JUDGE: "What's that?" COUNSEL FOR THE DEFENDANT: "The defendant takes exception to that order, your Honor." THE JUDGE: "What do you mean?" COUNSEL FOR THE DEFENDANT: "Your Honor, the defendant wishes that juror on this panel." THE JUDGE: "I will allow you a peremptory challenge for the successor." COUNSEL FOR THE DEFENDANT: "My exception."

tions which may cause a decision or decisions to be made in whole or in part upon issues extraneous to the case, including, but not limited to, community attitudes, possible exposure to potentially prejudicial material or possible preconceived opinions toward the credibility of certain classes of persons, the juror may not stand indifferent, the court shall, or the parties or their attorneys may, with the permission and under the direction of the court, examine the juror specifically with respect to such considerations, attitudes, exposure, opinions or any other matters which may, as aforesaid, cause a decision or decisions to be made in whole or in part upon issues extraneous to the issues in the case."[2] This statute is designed to impose a duty on the judge to examine jurors fully with respect to possible bias or prejudice if it appears that particular jurors or the jury pool as a whole may be influenced by extraneous factors to the extent that jurors would be unable to render an impartial verdict on the evidence presented to them and must, therefore, be excused for cause. The statute does not preclude a judge from excusing a juror without the specified examination. Rather, its focus is in the opposite direction; that is, if there is reason to suspect that a juror or jurors are not or may not be indifferent within the meaning of the statute, the judge must inquire fully before declaring jurors indifferent and allowing them to be seated. If there was error in the judge's action, therefore, it did not lie in a violation of G. L. c. 234, § 28.

The defendant next argues that the juror was excused because of her opposition to capital punishment. The beliefs of a prospective juror with respect to capital punishment are irrelevant in this Commonwealth since the death penalty may not be imposed, *Commonwealth* v. *O'Neal,* 369 Mass. 242 (1975) (*O'Neal II*); *Furman* v. *Georgia,* 408 U.S. 238 (1972), and, even when the death penalty could have been imposed, mere opposition to

---

[2] The 1975 amendment substituted the word "shall" for the word "may" following the word "court" in the quoted sentence.

capital punishment without more was not a valid ground for exclusion. *Commonwealth* v. *Curry,* 368 Mass. 195 (1975). *Commonwealth* v. *McAlister,* 365 Mass. 454 (1974). There is no suggestion in the record that the judge intended to exclude a class of jurors opposed to the death penalty.

The record in this case suggests that the ground of exclusion was not opposition to the death penalty. The judge made no inquiry of other jurors with respect to their opinions on capital punishment and only raised the issue with juror Ryan after she apparently made her beliefs known to a court officer.

The record is devoid of any suggestion of the judge's actual reason for exclusion. However, we are hesitant to second guess the action of a trial judge in the jury selection process where only one juror is involved. The trial judge bears a heavy responsibility for ensuring that only jurors who will fairly and attentively consider the evidence before them are seated, and he alone has an opportunity to observe the demeanor of the prospective juror. It may well be that from his judicial experience he concluded that he was confronted with a juror who was demonstrating her unwillingness to serve on the panel.

The judge has a great deal of discretion in the jury selection process. *Commonwealth* v. *McKay,* 363 Mass. 220, 223 (1973). *Commonwealth* v. *French,* 357 Mass. 356, 400, A-13 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972) ("[the judge] was entitled to exercise judgment, within a substantial range of discretion, concerning the capacity and suitability of each of them intelligently to perform the functions of a juror"). Our general rule has been that "[i]n the absence of action or inaction which constitutes a denial of constitutional rights ... or which constitutes an error of law, such as an abuse of discretion, we will not interfere with the trial judge in the jury selection process." *Commonwealth* v. *McKay, supra* at 223. See *Commonwealth* v. *Montecalvo,* 367 Mass. 46, 51 (1975).

On the basis of the record before us, we are unable to

find that the judge abused his discretion in excusing juror Ryan. However, we stress the importance of a trial judge's establishing on the record the cause for excusing a juror. The factors which influence the internal deliberative processes of a jury panel are such that any deviation from random selection other than for those causes specified by G. L. c. 234, § 28, must be suspect, and it is incumbent on the judge to demonstrate that his interference in the selection process is for cause and not based on personal whim. However, in the case now before us we find no indication that the defendant was denied a fair trial by the exclusion of a single juror.

3. *The charge.* It is clear that the only theory advanced by the Commonwealth to support a conviction of murder in the first degree was that of felony murder. The judge appropriately limited his charge to accord with this approach. He also appropriately prefaced the portion of his charge which was devoted to the murder indictment by instructing the jury as to the provisions of G. L. c. 265, § 1, which reads as follows: "Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree. Petit treason shall be prosecuted and punished as murder. The degree of murder shall be found by the jury."

The judge informed the jury that three alternative verdicts were available on the murder indictment: not guilty, guilty of murder in the first degree, or guilty of murder in the second degree. He also, of course, identified and defined armed robbery as a crime punishable by any term of years up to life imprisonment. The judge, in our view, was correct in submitting verdicts of murder in both the first and second degree for the jury's consideration, even though it could be argued that the evidence would support only one of two verdicts: either not guilty or guilty of murder in the first degree. In instructing as to murder

in the second degree, the judge specifically, and correctly, relied on the statutory language in c. 265, § 1, that the degree of murder is for the jury to determine. Further, it is clear that the jury, within their power to appraise evidence selectively, might have accepted as credible enough evidence to establish a conviction of murder in the second degree, but might have declined to accept such further evidence as tended to prove a case of murder in the first degree.[3]

The defendant's assignment of error is concerned solely with that portion of the charge in which the jury were told, in substance, that, even if they determined that the defendant was engaged in committing an armed robbery when he fired the fatal shots, they should consider "aggravating or extenuating" circumstances to determine whether the evidence was murder in the first or second degree. In substance, the jury were told that they "might or might not" consider the age of the defendant, whether the robbery was going smoothly, and whether it seemed to the jury that the killing was unnecessary for the perpetration of armed robbery. The defendant now argues that the "circumstances" were not fairly selected from the evidence.

We conclude that there was error in this aspect of the charge, but we do not reach this conclusion for the reasons urged by the defendant.[4] A homicide which the jury determined to be an armed robbery-murder is not properly reduced, on the basis of extenuating circumstances such as those enumerated in the charge, to murder in the second degree. We have no doubt that the judge's instructions

---

[3] But see *Commonwealth* v. *Rego,* 360 Mass. 385, 395 (1971), wherein, unlike the instant case, there was also some *affirmative* evidence which tended to show that the felony in which the defendants were participating at the time of the homicide was not a felony punishable by death or life imprisonment. See the *Rego* case at 393-396 for a discussion of the appropriate contents of the charge as to the murder indictment.

[4] From our review of the entire record, we do not agree with the defendant's assertion that the "circumstances" were not fairly selected.

were based on ambiguous language in previous opinions of this court. See *Commonwealth* v. *DiStasio*, 298 Mass. 562, 564, cert. denied, 302 U.S. 683, 759 (1937),[5] and cases there cited; cf. *Commonwealth* v. *Chase*, 350 Mass. 738 744, cert. denied, 385 U.S. 906 (1966). Because of the specificity of the language of the statute, c. 265, § 1, in our view the "aggravating circumstances" referred to in our cases are those delineated by the Legislature, viz.: murder committed with deliberately premeditated malice afore-thought, or committed with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or life imprisonment. Where a jury reach a determination that the statutory "circumstance" (in this case armed robbery-murder) has been met, they should return a verdict of murder in the first degree.

It follows that the instructions were erroneous. Never-theless, the error was harmless beyond a reasonable doubt, because the charge was more favorable to the defendant than that to which he was entitled.

We add that the charge should have included, in some appropriate form of words, an instruction that the jury have a duty, if they conclude that the defendant is guilty, to return a verdict of guilty of the highest crime which has been proved beyond a reasonable doubt against the defendant. See *Sparf & Hansen* v. *United States*, 156 U.S. 51, 63 (1895). This language would serve to impress on the jury that while they were empowered to return the lesser verdict, they had a duty to consider the evidence in light of the principles of law given to them by the judge.[6] The failure to give such an instruction, if error,

---

[5] In the *DiStasio* case, the "ambiguous" language at 564 was as fol-lows: "These statutes do not create two separate and distinct crimes, murder in the first degree and murder in the second degree, which must be pleaded accordingly. 'The legislature manifestly considers mur-der as one kind of species of crime, the punishment of which may be more or less severe according to certain aggravating circumstances, which may appear on the trial' " (citations omitted).

[6] As to murder, and the degree of murder, we think the charge in a case like this should include at least the following: a definition of homi-cide, and a definition of murder in the second degree; a definition of

was also harmless beyond a reasonable doubt, since such words could not conceivably favor the defendant's cause.

4. We have reviewed the entire record in this case and find no grounds for exercising our powers under G. L. c. 278, § 33E.

*Judgments affirmed.*

QUIRICO, J. (concurring). I concur in the judgment of the court affirming jury verdicts of guilty of murder in the first degree, armed robbery, and unlawfully carrying a handgun. I join in all but part 3 of the court's opinion.

At issue are the instructions a trial judge must give where the Commonwealth seeks to prove a felony murder, "[m]urder . . . in the commission or attempted commission of a crime punishable with death or imprisonment for life." G. L. c. 265, § 1. See *Commonwealth* v. *Balliro*, 349 Mass. 505, 512 (1965). By G. L. c. 265, § 1, such a murder is "murder in the first degree." The statute further provides that "[t]he degree of murder shall be found by the jury."

The Commonwealth submitted sufficient evidence to permit the jury to infer the commission of a murder in the course of an armed robbery. The trial judge instructed the jury on the two degrees of murder and then enumerated factors which he said the jury might consider in decid-

---

armed robbery and attempted armed robbery; a reading of the murder statute, c. 265, § 1; an identification of armed robbery as a crime "punishable with death or imprisonment for life"; and a submission to the jury of the issues whether the defendant committed a homicide, and whether that homicide was in the course of an armed robbery or attempted armed robbery. These factors are to be considered by the jury in light of (1) instructions by the judge as to the Commonwealth's burden of proof beyond a reasonable doubt, and (2) instructions that the jurors have a duty to return a verdict of guilty of the highest crime proved against the defendant. From this charge, the jury should appreciate their power and, more important, their duty, within the context of the statutory expression, "The degree of murder shall be found by the jury."

The charge in this case was generally sufficient. Indeed, as to the charge, the defendant excepts only to that aspect in which the judge arrayed the "circumstances" of the case.

Commonwealth *v.* Dickerson.

ing whether to return a verdict of murder in the first or second degree.[1]

---

[1] "Now, the law goes on to say this: Murder which does not appear to be in the first degree is murder in the second degree.

"So that you have two classifications of murder. We call it murder one and murder two. First-degree murder, second-degree murder.

"Then the law goes on to say: The degree of murder shall be found by the jury, and you are the absolute boss on that.

"Now, in reading this definition from the law, without the addition of that last sentence, you would conclude, and intelligently, that if you are satisfied beyond a reasonable doubt that this killing was committed by this defendant in the course of an armed robbery, your only verdict could be murder in the first degree. But, strangely enough, that isn't so, even though this murder may have been committed in the course of an armed robbery, it is still up to the jury to determine the degree of murder.

"A jury may return murder in the second degree, even though it's what we call a felony murder. That's what our Supreme Judicial Court has said. That's the highest court in the Commonwealth, who writes all of these decisions in the books here.

"Well,. the next sensible question to ask is — If it's a felony murder, what determines the jury to say murder in the first degree rather than murder in the second degree, and vice versa? Well, our Supreme Judicial Court has said that the degree of murder may be found by the jury, depending upon the circumstances as developed in the trial, aggravating or extenuating, I assume. But in no decision that I know has our Supreme Judicial Court gone beyond that to attempt to assist the trial court in instructing the jury or for the jury to have some guidelines as to what sort of circumstances developed at the trial that might make it murder one or murder two. And so that issue really ultimately is left to the good conscience and good judgment of the jury, I assume.

"Perhaps I can assist on my own in this respect: It may well be that a jury might consider, as an extenuating or an aggravating circumstance, the age of the perpetrator, whether or not the perpetrator of a crime was a half frightened teenager full of bravado or whether or not he was a mature man. A jury might or might not — I don't know — might or might not consider that a circumstance that might enter into a circumstance whether or not it would be murder first or murder second.

"It may be possible that a jury would consider differing circumstances, where a robbery was going off smoothly with no confusion and a killing occurred. It might be different in a confused situation where a victim fought back vigorously and there was a struggle and pandemonium reigned, so to speak. A jury might or might not consider those differently.

"If a killing occurred, so to speak, in cold blood, where it would seem to the jury where it was unnecessary for the perpetration of the crime of armed robbery, the jury might or might not consider those circumstances as relevant in determining whether or not a man in a felony murder should be found guilty of first-degree murder or second-degree

These instructions were erroneous both on the issue of the jury's function in determining the degree of murder in a felony murder case and on the issue of the factors which the jury may consider in arriving at their verdict. The trial judge's instruction, apparently approved by Justice Braucher, that "strangely enough, . . . even though this murder may have been committed in the course of an armed robbery, it is still up to the jury to determine the degree of murder," is particularly strange because I believe it is erroneous.

The jury must be instructed that if they find that a defendant has committed a (1) murder (2) in the commission or attempted commission of (3) a crime punishable by death or life imprisonment, it is then their duty to find the defendant guilty of murder in the first degree. These factors, not the age of the perpetrator or the confusion surrounding the crime, determine the degree of a defendant's guilt under G. L. c. 265, § 1. Because this question may recur, and because of some doubts in my mind whether the court's opinion is sufficiently clear and emphatic, I express my views in this separate concurrence.

1. *The jury's function.* Since the landmark cases of *Commonwealth* v. *Porter,* 10 Met. 263 (1845), and *Commonwealth* v. *Anthes,* 5 Gray 185 (1855), it has been the responsibility of a judge presiding at a trial by jury in a criminal case to decide all questions of law which arise during the trial and to instruct the jury fully and clearly on the rules of law by which they are to be governed in deliberating on their verdict. It is the responsibility of the jury to find the facts on the basis of the evidence, to apply to those facts the applicable rules as stated by the judge in his instructions, and to return a verdict accordingly.[2]

---

murder. That is about as much assistance as I can give you on that point.

"I emphasize once again that it really, it really rests in the consciences and the good judgment of the jurors."

[2] The evolution of this allocation of responsibility is traced in Howe, Juries as Judges of Criminal Law, 52 Harv. L. Rev. 582 (1939); Note,

Commonwealth *v.* Dickerson.

The propriety of these instructions does not involve a factual question. The jury were told that they could return a verdict of murder in the second degree even if they determined that there had been (1) a murder (2) in the commission or attempted commission of (3) a crime punishable by death or life imprisonment. These are the elements of felony murder — murder in the first degree under G. L. c. 265, § 1.

The presence of these statutory elements are thorny issues of fact for the jury. The jury must find the causal connection between the felony and the homicide required by the statutory language of "committed . . . in the commission or attempted commission." G. L. c. 265, § 1. See *Commonwealth* v. *Devereaux,* 256 Mass. 387, 391-393 (1926). The jury must further find that the foundation felony is one punishable by death or life imprisonment. The jury's belief forms the factual predicate for a verdict of murder in the first degree. When, for example, the jury do not believe that the felony is one punishable by death or life imprisonment — they may believe in a given case that the felony was breaking and entering rather than armed robbery[3] — then murder in the second degree is appropriate. *Commonwealth* v. *Rego,* 360 Mass. 385, 395-

---

The Changing Role of the Jury in the Nineteenth Century, 74 Yale L.J. 170 (1964); Kadish & Kadish, On Justified Rule Departures by Officials, an Exploration of Otherwise Patterned Official Roles: The Criminal Jury, 59 Cal. L. Rev. 905 (1971).

*Sparf & Hansen* v. *United States,* 156 U.S. 51 (1895), determined an analogous result for Federal courts. For recent cases on the issue whether the judge should instruct the jury whether they have any duty to follow the judge's instructions on the law, see *United States* v. *Moylan,* 417 F.2d 1002, 1005 (4th Cir.), cert. denied, 397 U.S. 910 (1969); *United States* v. *Boardman,* 419 F.2d 110, 116 (1st Cir. 1969), cert. denied, 397 U.S. 991 (1970); *United States* v. *Simpson,* 460 F.2d 515, 518 (9th Cir. 1972); *United States* v. *Dellinger,* 472 F.2d 340, 408 (7th Cir. 1972), cert. denied, 410 U.S. 970 (1973); *United States* v. *Dougherty,* 473 F.2d 1113, 1130-1137 (D.C. Cir. 1972) (excellent extended discussion by Levanthal, J.); Scheflin, Jury Nullification: The Right to Say No, 45 S. Cal L. Rev. 168 (1972).

[3] Breaking and entering is not a crime punishable by death or life imprisonment, whereas armed robbery is so punishable. See G. L. c. 265, § 17, and G. L. c. 266, § 16.

396 (1971). *Commonwealth* v. *White*, 353 Mass. 409, 425-426 (1967), cert denied, 391 U.S. 968 (1968).

Yet in this case the judge instructed the jury that they might find that the defendant committed a murder in the commission of an armed robbery — the facts necessary for murder in the first degree under G. L. c. 265, § 1 — and nonetheless return a verdict of murder in the second degree. This instruction purported to grant to the jury the express right to determine the murder to be in the second degree in spite of the facts they might have determined. Such an instruction trenches on our long-established, consistently applied, and zealously guarded line of demarcation between the respective roles, functions, and responsibilities of the judge and of the jury in the trial of a criminal case.

2. *History of the statute.* Following the definitions of the two degrees of murder,[4] G. L. c. 265, § 1, provides that "[t]he degree of murder shall be found by the jury." In my view, this language must be read in the context of a statute which succinctly distinguishes the degrees of murder. I take this language to mean that the jury shall find the degree of murder by deliberating on the facts, applying the judge's instructions on the law to those facts, and thereby determining which of the two degrees is appropriate. I do not believe this language permits a judge to instruct the jury that they may find all of the facts constituting murder in the first degree, and yet find the defendant guilty of murder in the second degree. Neither the language, nor the history of the statute in which it is contained, nor any decision of this court supports a subversion of the trial judge's exclusive role, vis-a-vis the jury, "to adjudicate finally, upon the whole question of law." *Commonwealth* v. *Anthes*, 5 Gray 185, 193 (1855). Nor is there any basis for encouraging the jury to usurp the

---

[4] "Murder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree. Murder which does not appear to be in the first degree is murder in the second degree."

power of the judge and thereby produce a verdict contrary to that required by the law and the facts.

By St. 1858, c. 154, the crime of murder was divided into two degrees. Section 3 of that statute introduced the language that "[t]he degree of murder is to be found by the jury." Massachusetts was not the first State to enact a statute creating degrees of murder which were to be found by the jury. Pennsylvania had adopted such a scheme in 1794, which numerous other States followed. By 1794 Pa. Laws c. 1766, § 2, "the jury, before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict, whether it be murder of the first or second degree." See Keedy, History of the Pennsylvania Statute Creating Degrees of Murder, 97 U. Pa. L. Rev. 759, 772-773 (1949); Wechsler & Michael, A Rationale of the Law of Homicide: I, 37 Colum. L. Rev. 701, 702-727 (1937). New Hampshire enacted such a statute in 1837 (1836 N.H. Laws c. 273), which appears to have been a model for this Commonwealth.

The legislative documents that precede the enactment of St. 1858, c. 154, suggest that murder was divided into degrees largely to mitigate the harshness of the common law rule imposing a mandatory death penalty on all murderers.[5] An address by Governor George N. Briggs to the

---

[5] By Res. 1837, c. 30, Commissioners were appointed to "reduce so much of the Common Law of Massachusetts, as relates to crimes and punishments and the incidents thereof, to a written and systematic Code." The report of these Commissioners, filed on January 27, 1844, proposed a comprehensive penal code which divided murder into degrees. Report of the Penal Code of Mass., Homicide, at 38 (1844). It also provided that "[t]he degree of murder or of manslaughter is to be found by the jury." An explanatory footnote stated that "[t]he object in making different degrees of murder is to make a distinction in punishment, making only the first degree punishable with death." *Id.* at 4 n.(c). No footnote explained the proposed function of the jury.

The report (*id.* at 6 n.[c]) relied primarily on the law of New Hampshire (1836 N.H. Laws c. 273), but referred also to the laws of Pennsylvania, Maryland, Virginia, Ohio, and Missouri.

In F. Wharton, Treatise on the Law of Homicide 354-358 (1855), it is said that by 1855, Pennsylvania, Maine, New Hampshire, Connecticut, New Jersey, and Tennessee divided murder into degrees and re-

Legislature in 1846 (1846 Senate Doc. No. 2) and the report of a Joint Special Committee of the Legislature (1846 Senate Doc. No. 58) display concern about the difficulty in obtaining a conviction when the jury must choose between a verdict of guilty of murder, punishable by death, and a verdict of not guilty. There is no indication of any intention to grant to the jury a discretion to decide the degree of murder regardless of the facts.

It was not until 1858 that the Legislature by St. 1858, c. 154, §§ 1, 2, established the two degrees of murder, and by § 3 provided that "[t]he degree of murder is to be found by the jury."[6] While the report of the Joint Special Committee (1846 Senate Doc. No. 58) did not specifically recommend the language quoted above from St. 1858, c. 154, § 3, it did note that New Hampshire had enacted a statute on January 13, 1837, establishing two degrees of murder and further noted that by that statute "[t]he jury are to find the degree by their verdict."

The creation of two degrees of murder was thus part of a desire to limit and restrict the mandatory death sentence by isolating certain murders appropriately punish-

---

quired the jury to determine the degree. The penal code was not enacted by the Legislature. L.W. Levy, The Law of the Commonwealth and Chief Justice Shaw 200-201 (1957).

[6] One writer notes that by this action the Legislature "voted to divide the crime of murder into two degrees, following the practice in some of the other states and the recommendation of a joint special committee in 1846, thus permitting a jury some latitude if it thought the accused had not committed a crime warranting death." E. Powers, Crime and Punishment in Early Massachusetts 1620-1692, 317 (1966).

Another writer suggests the following reason for the timing of St. 1858, c. 154: "In 1857 a female charged with murdering her husband by arsenic poisoning was tried in Plymouth County. The evidence against her was overwhelming, but the jury resisted conviction and was unable to reach a verdict. Months later, in 1858, the state legislature enacted the so-called 'murder statute' for the first time, distinguishing murder in the first degree and murder in the second degree, defining both and requiring a mandatory sentence of life imprisonment and not the death penalty for persons convicted of murder in the second degree. It had been argued to the legislature that regardless of the evidence, it was impossible to convict female defendants in murder cases because of the mandatory death penalty." R. Sullivan, Goodbye Lizzie Borden, 193 (1974).

able by death. See *McGautha* v. *California*, 402 U.S. 183, 198-199 (1971); Davis, The Movement to Abolish Capital Punishment in America, 1787-1861, 63 Am. Hist. Rev. 23 (1957). By delineating those murders for which death was considered proper, the statute would forestall the jury from taking the law into their own hands by refusing to convict of a capital offense. See H. Kalven and H. Zeisel, The American Jury 306-312 (1966). Far from authorizing jury discretion to choose a verdict of murder in the second degree when the facts warranted murder in the first degree, St. 1858, c. 154, § 3, was intended to oblige the jury to find facts within legislative categories.

3. *Massachusetts case law.* I am aware of no decision in which the subject matter of this concurrence has ever been put in issue or decided by this court. I respectfully suggest that the two cases cited by Justice Braucher on this subject, viz., *Commonwealth* v. *Chase*, 350 Mass. 738, 744, cert. denied, 385 U.S. 906 (1966), and *Commonwealth* v. *DiStasio*, 298 Mass. 562, 564, cert. denied, 302 U.S. 683, 759 (1937), did not involve or decide this point. The *Chase* case involved an indictment charging the defendant with murder in the second degree. At the trial the evidence was that the murder was committed in the commission or attempted commission of an armed robbery. The defendant contended that he could not be convicted of murder in the second degree on evidence proving the crime of murder in the first degree. Thus the issue before the court was whether proof of murder in the first degree precluded the defendant's conviction for the crime of murder in the second degree charged against him, and whether the defendant was therefore entitled to a directed verdict of not guilty. We held that he was not. Clearly the *Chase* case did not in any way involve the issue whether a jury at the trial of an indictment charging murder in the first degree, after finding that the murder was committed in the commission or attempted commission of an armed robbery, a crime punishable with imprisonment for life, have the right to find the defendant guilty of murder in the second degree. When this court said in the *Chase* case, *supra* at

744, that "we are not persuaded that the language in [G. L.] c. 265, § 1, was intended to limit the operation of the felony-murder rule to first degree murder," it did so to emphasize the fact that on an indictment charging murder in the second degree the jury could convict the defendant of that crime although the crime actually committed was murder in the first degree. That does not warrant a conclusion that the court meant to say, or was saying, that on a charge of murder in the first degree the jury could properly find the defendant guilty of murder in the second degree notwithstanding proof of the greater degree.

The *Chase* decision is but one of a number of cases, including the *DiStasio* decision, *supra,* to the effect that the "murder statute," St. 1858, c. 154, now G. L. c. 265, § 1, "does not create two separate and distinct crimes, but that the Legislature 'considers murder as one kind or species of crime, the punishment of which may be more or less severe according to certain aggravating circumstances, which may appear on the trial.' " *Commonwealth* v. *Chase, supra* at 744.

In the early case of *Commonwealth* v. *Gardner,* 11 Gray 438 (1858), the court held that the statute did not establish any new crimes, but only two degrees of the same crime, one of which, murder in the first degree, was punishable with death as formerly, and the other, murder in the second degree, was punishable by imprisonment for life, the difference in punishment being due to the difference between the two degrees of the crime as defined by the statute. In speaking on the same statute, this court said in *Commonwealth.* v. *Desmarteau,* 16 Gray 1, 15 (1860): "The statute provision has only reference to the extent of the punishment, *and for that purpose the jury are required to find the degree"* (emphasis supplied).

The decision of this court in *Commonwealth* v. *French,* 357 Mass. 356 (1970), judgments vacated as to death penalty sub nom. *Limone* v. *Massachusetts,* 408 U.S. 936 (1972), contains language which has since been cited in *Commonwealth* v. *O'Neal,* 369 Mass. 242, 274 n.1 (1975)

(*O'Neal II*)  (Hennessey, J., concurring), as supporting
the position now taken by Justice Braucher.

In the appendix to the *French* opinion dealing with
"[v]arious less significant issues raised by assignments of
error" the court said at 405: "A-40. In defining murder,
the judge first read to the jury G. L. c. 265, § 1, and
defined malice aforethought. He then said that if the jury
believed 'the contention of the Commonwealth, that this
Deegan murder was planned in advance, it is murder in
the first degree.' He made it clear, however, that, if they
saw fit to do so, they could return a verdict of murder
in the second degree even if 'there [was] a plan in advance
to kill Deegan.' He had previously said that 'the jury have
the power to decide the degree of murder.' This ade-
quately stated the law."

I do not consider the paragraph "A-40" quoted above
from the appendix to the *French* decision to be a holding
one way or the other on the subject matter of this con-
currence. An examination of the original records in that
case reveals that the paragraph represents the disposition
of substantially similar assignments of error by most of
the defendants in that case to the effect (a) that the trial
judge's statement to the jury that if they believed "the
testimony of the Commonwealth ... that this Deegan mur-
der was planned in advance, it is murder in the first de-
gree" was error because it improperly imposed on the jury
his own opinion on how they should evaluate the testi-
mony and permitted them to give second-class considera-
tion to the question whether or not the facts amounted
to murder in the second degree, and (b) that the trial
judge failed to instruct the jury sufficiently on the ele-
ments of and distinction between murder in the first de-
gree and murder in the second degree. Neither these
assignments of alleged error nor the arguments of the
parties raised or referred to the question whether the
jury had the power to return a verdict of guilty of murder
in the second degree if they found that "this Deegan
murder was planned in advance." In view of the limited

assignments of error and arguments thereon, it is my opinion that the statement in the decision that "[t]his adequately stated the law" disposed only of the claims that the judge tried to impose his opinion on a factual question on the jury and that he had failed to define and distinguish the two degrees of murder. I attribute nothing more to that statement.

Our decision in *Commonwealth* v. *Corcione,* 364 Mass. 611, 614-615 (1974), includes the following statement: "He [the defendant] also argues that the judge improperly precluded consideration by the jury of a verdict of guilty of second degree murder. G. L. c. 265, § 1. See *Commonwealth* v. *Chase,* 350 Mass. 738 (1966)." However, that question was not considered further because the court said it was reversing the judgments for other reasons.

The concurring opinion of Justice Hennessey, now the Chief Justice, in *O'Neal II,* at 274 n.1, included the following statement: "It can be argued that the law of this Commonwealth is that murder in the second degree must be submitted to the jury as a permissible verdict in every murder case, including rape-murder, regardless of circumstances. . . . [Citations of the *French, Chase, Desmarteau, Gardner,* and *Corcione* cases, all *supra,* and three other cases omitted.] From this it can be further argued that, since second degree murder is not punishable by the death penalty, the jury have unconstitutional untrammeled discretion in a rape-murder to choose between life imprisonment and the death penalty." The concurring opinion containing that suggested argument was not joined by any of the six other Justices who participated in the decision of the *O'Neal II* case. I know of no other decision in which that argument has been passed on by this court.

It is my conclusion, based on a consideration of the various opinions of this court which are cited and discussed above, that we have never held that by virtue of St. 1858, c. 154, now G. L. c. 265, § 1, the jury have "untrammeled discretion" to return a verdict of guilty of murder either in the first degree or in the second degree against a defendant who is found to have committed mur-

der, and more specifically in a case involving a defendant found to have committed acts which constitute murder in the first degree as defined in the statute.

4. *Other jurisdictions.* Having noted earlier in this opinion that our St. 1858, c. 154, was probably patterned after the 1836 N.H. Laws c. 273, which later became Rev. Stat. Ann. § 585:3 (1955), and was ultimately repealed by 1974 N.H. Laws c. 34:12, it may be helpful to examine the effect given to that statute by the Supreme Court of New Hampshire. That statute created two degrees of murder and provided that "[e]very Jury who shall find any person guilty of murder, hereafter committed, shall also find by their verdict, whether it is of the first or second degree."

In *Pierce* v. *State,* 13 N.H. 536 (1843), New Hampshire emphatically rejected the view that juries could determine the law in criminal cases, very much as was done in this Commonwealth by the later decisions in *Commonwealth* v. *Porter,* 10 Met. 263 (1845), and *Commonwealth* v. *Anthes,* 5 Gray 185 (1855).

In *State* v. *Thorp,* 86 N.H. 501, 504-545 (1934), the court interpreted the statute permitting the jury to determine degrees of murder, and rejected an argument that the defendant was entitled to an instruction regarding murder in the second degree. It said: "The court did not err in refusing to instruct the jury that they might find the defendant guilty of a lower grade of homicide than that of first-degree murder (even assuming the request to so charge had been seasonably made), since there was no evidence from which second-degree murder or manslaughter could reasonably be inferred.... The contention that in murder cases the jury should be permitted to exercise leniency without restriction is untenable. 'The proposition that a judge administering justice in criminal cases commits an error ... by failing to tell a jury that they may ... find a verdict unwarranted by the evidence ... would lead to a perversion of justice.' *State* v. *Young,* 67 N.J.L. 233, 234 (1902). Furthermore, since the jury in the present case declined to exercise such leniency as the statute allowed, it is difficult to understand how the de-

fendant could possibly have been harmed by the refusal to grant his request, even if legally entitled to the instruction asked for."

In other jurisdictions where the jury determine the degree of murder, and felony murder is murder in the first degree, there is substantial authority that no instruction on murder in the second degree is warranted for a felony murder where there is no factual basis for such an instruction.[7] If no instruction is required, a fortiori the jury would not be expressly instructed that they may find that a murder committed in the course of an armed robbery is murder in the second degree. These precedents are not binding, but I find them persuasive.

5. *Conclusion.* It seems almost incredible to me that for the first time in the 119 years since the enactment of St. 1858, c. 154, now G. L. c. 265, § 1, we should be called on to pass on the question of what a trial judge may or must tell a jury about what factors can be considered in deciding whether a murder is in the first degree or in the second degree. It is my opinion that the reason the question has never come up before is that the answers are

---

[7] *State* v. *Conner,* 241 N.W.2d 447, 461 (Iowa 1976): "Under the only theory of murder submitted to the jury here, defendant could under the evidence only be found guilty of first-degree murder or acquitted. The court did not err in failing to submit second-degree murder." *State* v. *Nasello,* 325 Mo. 442, 459 (1930). *State* v. *Monahan,* 16 N.J. 83, 94, cert. denied, 348 U.S. 889 (1954). *Bandy* v. *State,* 102 Ohio St. 384, 402-403 (1921). *State* v. *Bradshaw,* 101 R.I. 233, 242 (1966). *State* v. *Saccoccio,* 50 R.I. 356, 361 (1929): "Our statute says that the jury may find the degrees of murder and expressly makes murder committed in the course of robbery murder in the first degree. The statute was not intended to leave the determination of the degree of murder in every case to the jury." *Wooden* v. *Commonwealth,* 208 Va. 629, 634-635 (1968).

Contra, *Commonwealth* v. *Meas,* 415 Pa. 41, 45 (1964): "Moreover, in a trial on a murder indictment, the jury has the *exclusive* right to fix the degree of guilt and may not be deprived of this right, even though the only evidence in the case establishes that the killing was committed in the perpetration of a felony: *Commonwealth* v. *Turner,* 367 Pa. 403 . . . (1951)" (emphasis in original).

An exhaustive treatment of these questions may be found in Annots. 21 A.L.R. 603 (1922), 27 A.L.R. 1097 (1923), and 102 A.L.R. 1019 (1936).

written into the statute itself and they have been there since its original enactment. I would read the statute to mean exactly what it says and that is (a) that "[m]urder committed with deliberately premeditated malice aforethought, or with extreme atrocity or cruelty, or in the commission or attempted commission of a crime punishable with death or imprisonment for life, is murder in the first degree," and (b) that "[m]urder which does not appear to be in the first degree is murder in the second degree." For the meaning of "murder" apart from degrees, I would go to the common law.

I believe that the proper meaning of the concluding sentence of G. L. c. 265, § 1, to the effect that "[t]he degree of murder shall be found by the jury," is that the jury should follow substantially the same procedure which they would follow in any criminal case, particularly one charging a crime in an aggravated form such as assault with a dangerous weapon, assault with intent to murder, or assault with intent to rob. That procedure, in a case involving a charge of murder in the first degree, would involve the following steps: (a) the jury must first find the facts of the case, (b) they must decide whether on the facts found the defendant committed the crime of murder, (c) if he did, they must decide whether the murder comes within any one of the three statutory categories of murder in the first degree, (d) if it does, they must return a verdict of guilty of murder in the first degree, (e) if it does not, they must return a verdict of guilty of murder in the second degree, and (f) in all their deliberations and decisions they must follow and apply the law as given to them by the trial judge on all phases and aspects of the case.

I recognize and concede, of course, that, if jurors thus instructed fail to follow the judge's instructions and, in violation of their duty, find a defendant in such a case guilty of murder in the second degree and the court accepts and records their verdict, it cannot be set aside later. However, the reason the verdict cannot be set aside later is not because the jury had the right to return it but

rather because the Commonwealth cannot appeal therefrom. The verdict in such a case is the result of the jurors' exercise of their power[8] to produce such a result and not of the right to do so. The helpless position of the Commonwealth is common to any criminal case, whether murder or some other offense, where jurors having found facts constituting the crime charged nevertheless return a verdict of guilty of a lesser offense included in that charged, or a verdict of not guilty. However, the fact that realistically we must concede that jurors have the power to produce such a result does not require that we must therefore conclude (a) that they have any right to do so, or (b) that the trial judge must inform them of the existence of that power and instruct them on what factors they may or must consider when they are contemplating the return of a verdict other than one required on the facts found by them and the law applicable thereto.

It is my conclusion that G. L. c. 265, § 1, does not exempt jurors in a trial on an indictment charging murder in the first degree from the basic rules governing the distinctly separate roles of the judge and the jury in all other criminal trials. It does not endow them with any power to exercise clemency. It does not give them the right to return a verdict contrary to the facts or the law of the case. It does not authorize them to contrive a verdict designed by them to control the punishment which they think should be imposed on the defendant for his crime. Rather it requires them to return a just verdict on the basis of the facts found by them and the law applicable thereto as stated by the judge, to the end that the judge may impose such penalty as is required or permitted by law.

BRAUCHER, J. (with whom Kaplan, J., joins, concurring in the result). I do not join in part 3 of the opinion of

---

[8] "The judge cannot direct a verdict [of guilty] it is true, and the jury has the power to bring in a verdict in the teeth of both law and facts." *Horning* v. *District of Columbia,* 254 U.S. 135, 138 (1920) (Holmes, J.).

the court. I agree that the judge correctly instructed the jury that three alternative verdicts were possible on the murder indictment: guilty of murder in the first degree, guilty of murder in the second degree, or not guilty. This was in accordance with G. L. c. 265, § 1: "The degree of murder shall be found by the jury." But I do not agree that there was error in the charge to the jury.

Contrary to the view taken by the court, I think the jury could properly return a verdict of guilty of murder in the second degree even though they found that the murder was committed in the course of an armed robbery. "It has often been said that this statute does not create two separate and distinct crimes, but that the Legislature 'considers murder as one kind or species of crime, the punishment of which may be more or less severe according to certain aggravating circumstances, which may appear on the trial.' *Commonwealth* v. *DiStasio*, 298 Mass. 562, 564 [cert. denied, 302 U.S. 683, 759 (1937)] and cases there cited." *Commonwealth* v. *Chase*, 350 Mass. 738, 744, cert. denied, 385 U.S. 906 (1966). Accordingly, we held in the *Chase* case that a person guilty of felony murder could be indicted and convicted of murder in the second degree.

Thus the jury, in a case of armed robbery-murder, were required to find that it was murder in either the first or the second degree. As the statute confers on the jury a dispensing power, it is quite proper for the judge to help them with instructions suggesting how they should exercise it. Indeed, I think, if requested by the defendant, the judge would be bound to give such instructions. The factors listed by the judge in the present case were not unfairly drawn, and he made it clear that the question was entirely for the jury, as the statute requires. Without reference to illustrative factors, a general charge might be uninformative or even confusing.